Bryan K. Weir, CA Bar # 310964
William S. Consovoy, VA Bar # 47704 (*pro hac vice* to be filed)
Thomas R. McCarthy, VA Bar # 47154 (*pro hac vice* to be filed)
J. Michael Connolly, VA Bar # 77632 (*pro hac vice* to be filed)
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243-9423

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON HIGGINSON,<br><br>                  Plaintiff,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as ATTORNEY GENERAL OF CALIFORNIA; and CITY OF POWAY, CALIFORNIA,<br><br>                  Defendants. | Case No.: '17CV2032 WQHJLB<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Don Higginson brings this action against Defendants Attorney General Xavier Becerra and the City of Poway, California to have the California Voting Rights Act and Map 133 declared unconstitutional and to enjoin their enforcement. Plaintiff alleges as follows:

**INTRODUCTION**

1. The Equal Protection Clause of the Fourteenth Amendment "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017) (citation omitted). "[I]f racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Id.* at 1464.

1

2. The Supreme Court has assumed—but not yet decided—that complying with Section 2 of the Voting Rights Act of 1965 ("VRA"), which has been interpreted to protect minorities against vote dilution, could be a compelling interest that upholds a districting plan. *Id.* But the Court also has emphasized that Section 2 is in obvious tension with the Fourteenth Amendment because it, by definition, makes race the predominant factor in districting decisions.

3. The Supreme Court issued a series of decisions, beginning with *Thornburg v. Gingles*, 478 U.S. 30 (1986), in an attempt to address this concern. Ultimately, the Court held that an at-large voting system will violate Section 2 only if a minority group proves both that it can form a compact single-member district and that voting is racially polarized. These requirements, the Court has warned, ensure that Section 2 is an anti-discrimination provision, and not an unconstitutional mandate to maximize electoral power on the basis of race.

4. The California Legislature did not heed the Supreme Court's warning. Instead, California passed its own voting rights act—the California Voting Rights Act of 2001 ("CVRA")—to override the constraints the Supreme Court has imposed in an attempt to save Section 2 from unconstitutionality. Under the CVRA, local governments must abandon at-large voting systems if racially polarized voting exists—regardless of whether the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district.

5. Accordingly, the CVRA flagrantly violates the Fourteenth Amendment. Its "race-based sorting of voters" does not serve a "compelling interest" nor is it "narrowly tailored." *Cooper*, 137 S. Ct. at 1464.

6. The City of Poway is one of many California localities that for decades used at-large voting to elect its City Council. Recently, however, the City received a demand letter alleging that racially polarized voting existed in the City, and that the City therefore would be sued under the CVRA—and exposed to legal liability and millions of dollars of fees—unless it switched to by-district elections. Given the prospect of liability, the City

complied with the CVRA and abandoned at-large voting. On October 3, 2017, the City enacted four single-member districts solely as a consequence of the CVRA. City elections using these new districts will be held in 2018.

7. Don Higginson is a City resident and a registered voter. Because of the redistricting that the CVRA has imposed on the City, Mr. Higginson will now reside in and vote in District 2. The creation of that district, like all of the City's new districts, is traceable to the CVRA's requirement that the City engage in racial gerrymandering. Mr. Higginson thus has brought this action to vindicate his constitutional rights under the Fourteenth Amendment.

## JURISDICTION AND VENUE

8. This Court has jurisdiction to hear and decide Plaintiff's claim brought under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3), and 1357. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

10. Plaintiff Don Higginson is a City resident and a registered voter. Because the California Voting Rights Act has forced the City to abandon at-large elections, he will now reside in and vote in District 2. Mr. Higginson alleges that District 2, like all of the City's districts, is racially gerrymandered as a result of the redistricting the California Voting Rights Act has imposed on the City.

11. Defendant Xavier Becerra is the Attorney General of California. Defendant Becerra is charged by Article V, Section 13 of the California Constitution with the duty to see that the laws of California are uniformly and adequately enforced. He is sued in his official capacity.

12. Defendant City of Poway is a California general law city and a municipal corporation organized and existing under and by virtue of the laws of the State of California. The City is subject to the California Voting Rights Act. As a direct result of that

3

statute, the City has abandoned its at-large voting system and switched to by-district elections that are the product of racial gerrymandering.

## FACTUAL ALLEGATIONS

### A. The Fourteenth Amendment

13. The Fourteenth Amendment prohibits "racial gerrymanders in legislative districting plans." *Cooper*, 137 S. Ct. at 1463. Absent a "sufficient justification," the Fourteenth Amendment forbids a State or political subdivision from "'separating its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

14. Under controlling precedent, "strict scrutiny applies when race is the 'predominant' consideration in drawing the district lines such that 'the legislature subordinates traditional race-neutral districting principles ... to racial considerations.'" *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (quoting *Miller*, 515 U.S. at 916). Once strict scrutiny is triggered, the burden "shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 137 S. Ct. at 1464.

### B. Section 2 of the Voting Rights Act

15. Congress passed the Voting Rights Act of 1965 ("VRA") to enforce the right to vote free from racial discrimination. Section 2 thus bars practices "imposed or applied ... in a manner which results in a denial or abridgment" of the right to vote. 52 U.S.C. § 10301(a) (formerly 42 U.S.C. § 1973). A violation of Section 2 "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens … in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

16. Section 2 has been interpreted to protect minorities against vote dilution, and the Supreme Court has held that a municipality's use of multimember and at-large districts can, in some circumstances, "dilute[] minority voting strength by submerging [minority] voters into the white majority, denying them an opportunity to elect a candidate of their choice." *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009). At the same time, the Supreme Court has tried to interpret Section 2 in a way that might keep it from violating the Fourteenth Amendment's ban on racial gerrymandering.

17. To that end, there are "three 'necessary preconditions' for a claim that the use of multimember [or at-large] districts constitute[s] actionable vote dilution under § 2: (1) The minority group must be 'sufficiently large and geographically compact to constitute a majority in a single-member district,' (2) the minority group must be 'politically cohesive,' and (3) the majority must vote 'sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.'" *Id.* (quoting *Gingles*, 478 U.S. at 50-51). "In a § 2 case," therefore, "only when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." *Id.* at 11-12.

18. The Supreme Court has repeatedly emphasized the importance of the first *Gingles* factor—*i.e.*, that the minority group be sufficiently large and geographically compact to constitute a majority in a single-member district—in ensuring that Section 2 enforces the right to vote instead of requiring racial gerrymandering. The requirement is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993). "Without such a showing, 'there neither has been a wrong nor can be a remedy.'" *Bartlett*, 556 U.S. at 15 (quoting *Growe*, 507 U.S. at 41). Absent this requirement, in other words, Section 2 would entitle "minority groups to the maximum possible voting strength," *id.* at 16, which "causes its own dangers, and they are not to be courted," *Johnson v. De Grandy*, 512 U.S. 997, 1016 (1994).

19. The compactness requirement thus has been indispensable—at least to date—in saving Section 2 from constitutional doubt. Section 2 undeniably makes race the predominant factor—even with the compactness precondition in place—when it requires creation of majority-minority districts. *See Shaw*, 517 U.S. at 906-08. The Supreme Court has "assumed," but not held, "that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965." *Cooper*, 137 S. Ct. at 1464. But compliance with Section 2 is assumed to be a compelling interest only because it is understood to remedy racial discrimination in voting. *Bartlett*, 556 U.S. at 10. There is no discrimination to remedy if the minority population is not sufficiently "compact" such that it would have "the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40.

20. Furthermore, the use of race in districting must be narrowly tailored even assuming the existence of a compelling interest. *Cooper*, 137 S. Ct. at 1464. Section 2 could never meet that requirement in the absence of the compactness precondition. "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Shaw v. Reno,* 509 U.S. 630, 657 (1993). Eliminating the compactness requirement, in other words, would "unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Bartlett*, 556 U.S. at 21 (citation omitted).

C. **The California Voting Rights Act**

21. Over time, the California Legislature became dissatisfied with the Supreme Court's interpretation of Section 2 and wanted to "provide a broader basis for relief from vote dilution than available under the [VRA]." *Jauregui v. City of Palmdale*, 172 Cal. Rptr. 3d 333, 350 (Cal. Ct. App. 2014). The Legislature believed that the Court's "[r]estrictive interpretations" of Section 2, which were adopted to try to avoid racial-gerrymandering concerns, were simply wrong. Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976

6

(2001-2002 Reg. Sess.) as amended Apr. 9. 2002, p.2. Flouting the Supreme Court, the Legislature concluded that "geographical compactness would not appear to be an important factor in assessing whether the voting rights of a minority group have been diluted or abridged by an at-large election system." *Id*. at 3.

22. The California Voting Rights Act of 2001 ("CVRA") was enacted to "avoid that problem." *Id.* at 2. The CVRA thus was designed to "make it easier to successfully challenge at-large districts" by eliminating the *Gingles* precondition that "a minority community be sufficiently concentrated geographically to create a district in which the minority community could elect its own candidate." Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended Jun. 11, 2002, p.4. The CVRA thus overrides the "[r]estrictive interpretations given to the [VRA]" by allowing a plaintiff to establish "[vote] dilution or abridgment of minority voting rights" merely "by showing the [other] two [*Gingles*] requirements." Assem. Com. on Judiciary, *supra*, at 2-3.

23. To that end, the CVRA provides that "[a]n at-large method of election may not be imposed or applied in a manner that impairs the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election ... as a result of the dilution," Cal. Elec. Code § 14027, and that "[a] violation of Section 14027 is established if it is shown that racially polarized voting occurs in elections for members of the governing body of the political subdivision or in elections incorporating other electoral choices by the voters of the political subdivision," Cal. Elec. Code § 14028(a).

24. No other showing is needed to establish a CVRA violation. "The fact that members of a protected class are not geographically compact or concentrated may not preclude a finding of racially polarized voting, or a violation of Section 14027 and this section, but may be a factor in determining an appropriate remedy." Cal. Elec. Code § 14028(c).

25. Moreover, "[p]roof of an intent on the part of the voters or elected officials to discriminate against a protected class is not required." Cal. Elec. Code § 14028(d). Factors

7

"such as the history of discrimination ... are probative, but not necessary factors to establish a violation of Section 14027 and this section." *Id*. § 14028(e).

26. Once there is a finding of racially polarized voting, the political subdivision must abandon its at-large system. "Upon a finding of a violation of Section 14027 and Section 14028, the court shall implement appropriate remedies, including the imposition of district-based elections, that are tailored to remedy the violation." Cal. Elec. Code § 14029.

27. And, no matter the remedy, the political subdivision will be liable for attorneys' fees and costs because it will have been found liable under the CVRA. "In any action to enforce Section 14027 and Section 14028, the court shall allow the prevailing plaintiff party, other than the state or political subdivision thereof, a reasonable attorney's fee, ... and litigation expenses including, but not limited to, expert witness fees and expenses as part of the costs. Prevailing defendant parties shall not recover any costs, unless the court finds the action to be frivolous, unreasonable, or without foundation." Cal. Elec. Code § 14030.

28. In 2016, the election code was amended to afford a political subdivision in violation of the CVRA a safe harbor from the expense of litigation. "Before commencing an action to enforce Sections 14027 and 14028, a prospective plaintiff shall send by certified mail a written notice to the clerk of the political subdivision against which the action would be brought asserting that the political subdivision's method of conducting elections may violate the California Voting Rights Act." Cal. Elec. Code § 10010(e)(1). "A prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 45 days of the political subdivision's receipt of the written notice described in paragraph (1)." *Id*. § 10010(e)(2).

29. The political subdivision then must decide whether it will comply with the demand or be sued under the CVRA. "Before receiving a written notice described in paragraph (1), or within 45 days of receipt of a notice, a political subdivision may pass a resolution outlining its intention to transition from at-large to district-based elections,

specific steps it will undertake to facilitate this transition, and an estimated time frame for doing so." Cal. Elec. Code § 10010(e)(3)(A). "If a political subdivision passes a resolution pursuant to subparagraph (A), a prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 90 days of the resolution's passage." *Id*. § 10010(e)(3)(B).

30. In sum, the political subdivision can limit its legal exposure under the CVRA only by quickly agreeing to abandon its at-large system and begin the process of transitioning to by-district elections. Only if the political subdivision capitulates, in other words, will the complaining party have his or her fees "capped at $30,000." Cal. Elec. Code § 10010(f)(3).

**D. The Shenkman Demand Letter**

31. Like many California localities, the City of Poway for decades used an at-large voting system to elect its City Council.

32. On June 7, 2017, the City received a certified letter from an attorney, Kevin Shenkman, asserting that the City's at-large system violates the CVRA.

33. In particular, Mr. Shenkman asserted that "voting within Poway is racially polarized, resulting in minority vote dilution, and therefore Poway's at-large elections violate the [CVRA]." He added that the CVRA is "different" from the VRA "in several key respects, as the [California] Legislature sought to remedy what it considered restrictive interpretations given to the federal act." "The California Legislature dispensed with the requirement in *Gingles* that a minority group demonstrate that it is sufficiently large and geographically compact to constitute a 'majority-minority district.' Rather, the CVRA requires only that a plaintiff show the existence of racially polarized voting to establish that an at-large method of election violates the CVRA, not the desirability of any particular remedy."

34. According to Mr. Shenkman, "Poway's at-large system dilutes the ability of Latinos (a 'protected class') to elect candidates of their choice or otherwise influence the outcome of Poway's council elections." Therefore, unless the City "voluntarily change[s]

9

its at-large system of electing council members ... [he] will be forced to seek judicial relief." He reminded the City that he had sued "the City of Palmdale for violating the CVRA. After an eight-day trial, we prevailed. After spending millions of dollars, a district-based remedy was ultimately imposed upon the Palmdale city council, with districts that combine all incumbents into one of the four districts." Mr. Shenkman gave the City until July 21, 2017 to notify him whether it would come into compliance with the CVRA.

### E. The City's Response

35. On June 20, 2017, in response to the Shenkman letter, the City Council held a closed session to discuss the threatened CVRA litigation. As reported out by the City Attorney after the closed session, the City Council provided direction to staff to prepare a resolution of intention for establishing and implementing by-district elections for the City Council members to be presented for consideration at the July 18, 2017 City Council meeting.

36. In recommending the adoption of the resolution ahead of the July 18 meeting, the City Attorney explained that "the risks and costs associated with protracted CVRA litigation—particularly in light of results in all other cities that have fought to retain at-large voting—cannot be ignored. The public interest may ultimately be better served by a by-district electoral system if converting to that system avoids significant attorneys' fees and cost award."

37. At the City Council meeting on July 18, an outside attorney the City hired to advise it on the Shenkman letter outlined the difficulty in defending CVRA lawsuits. He provided examples of prior attorney's fees awards under the CVRA and explained that "[t]he state statutory scheme when it was adopted by the state legislature effectively removed burdens of proof that exist under the federal Voting Rights Act. And what that effectively means is that it is virtually impossible for governmental agencies to defend against lawsuits brought under the CVRA. And that's in fact why you see cities throughout the State converting … in the face of these demand letters."

1    38. Three citizens spoke during the public discussion portion of the meeting. The first speaker, a long-time advocate for by-district elections, said "I thought we'd have to go through the initiative process to make it happen. It's amazing what … one letter from a lawyer can do."

39. The second speaker supported change to the electoral process in the City more generally but was not an advocate for by-district elections necessarily. He stated: "I think what you are doing as far as changing to districts is not [the] optimum but [] certainly will get rid of the problem of getting the lawsuit."

40. The third speaker opposed a change to by-district elections but acknowledged to the City Council that, due to the threatened lawsuit, "I understand you don't really have a choice here."

41. Each member of the City Council then expressed his strong disapproval of the changes that the CVRA was forcing the City to make.

42. City councilmember Jim Cunningham explained that "the [safe-harbor provision] is truly the shield … we are using to avoid attorney's fees, and costs, and protracted litigation." He then specifically sought advice from the outside attorney on whether they were utilizing that provision correctly to avoid those burdens.

43. City councilmember Dave Grosch explained that he supported by-district elections eight years ago. But his experience as an at-large councilmember where he serves and supports the entire community—and not just one district—convinced him that at-large elections were better. In reference to Mr. Schenkman's letter, he added, "I really hate that the City is … being told to do this by someone who doesn't live in Poway" and made clear that the letter was the only reason the City was changing to by-district elections.

44. City councilmember John Mullin asked the outside attorney, "If at some point in time, … somebody does succeed in challenging any or all of the portions of the act, would we … then have the option to revisit the decision to use district elections?" The attorney explained the City would be able to do so. Councilmember Mullin concluded: "We've gone through denial, and we've gone through anger, and now we're into

11

acceptance. So, to those of you in the audience who think that we should be fighting this, we concur, we were there awhile back as well. I have no illusions that this will lead to better government for our city. I'm pretty proud of the job we do as we are now constituted… . But having said all of that, again we have a gun to our heads and we have no choice."

45. Deputy Mayor Barry Leonard said, "I get it. I hate it but I get it." He explained his view that "we respond to everybody in the City. We don't pick certain people in certain neighborhoods and say we'll treat them any differently. There is no evidence of that whatsoever. So, I feel like we're already being found guilty of something and we don't have a chance to prove our innocence. It's just the deck is stacked. So, rather than spend a million dollars of the taxpayers' money, we roll over to these bullies."

46. Mayor Steve Vaus concluded, "I'll just echo that this council does a remarkable job [with at-large elections]. … But we've got to do what we've got to do. And job one is to protect the treasure of our constituents. And it's their money we'd be putting at risk [with litigation] and none of us are willing to do that."

47. The City Council adopted Resolution No. 17-046 setting forth its intention to transition from at-large to by-district elections, pursuant to Elections Code section 10010(e)(3)(A). The Resolution stated that after "the City [had] received a letter threatening action under the California Voting Rights Act," it had "determined that it is in the best interest of the City to move from its current at-large electoral system to a by-district election for members of the City Council, in furtherance of the purposes of California Voting Rights Act."

48. On August 1, 2017, August 8, 2017, and August 18, 2017, the Council held meetings where it received public input on drawing new districts, consulted a demographer on how to draw new districts, and evaluated potential maps for the new districts.

49. On August 31, 2017, the Council voted 5-0 to proceed with Map 133, an election plan that divides the City into four districts.

50. On September 19, 2017, the Council introduced an ordinance for first reading and public comment that enacted Plan 133. For his part, councilmember Mullin reiterated his view that the City "went down this path with the full recognition that this was our only reasonable option. Never did I, nor do I now, believe that this will lead to better governance for our city. … I support the [proposed ordinance] because of a lack of choice and not because I think it's best for the City. … I'm still begrudgingly doing this."

51. On October 3, 2017, the Council adopted the ordinance enacting Map 133. In voting for the ordinance, councilmember Mullin stated, "I don't want my affirmative vote on this item to be construed in any way as my support for this notion for district elections. … I will support the motion because we have no choice not because I think district elections are what's best for the city."

52. The City would not have switched from at-large elections to single-districts elections but for the prospect of liability under the CVRA.

## CAUSE OF ACTION

## 42 U.S.C. §§ 1983, 1988

**(Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution)**

53. Plaintiff realleges paragraphs 1 through 52 as if fully stated herein.

54. Section 1 of the Fourteenth Amendment to the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

55. The Equal Protection Clause prohibits the use of race as the predominant factor in drawing electoral districts unless the State or political subdivision has a compelling interest in doing so and the use of race is narrowly tailored to that interest.

56. The CVRA makes race the predominant factor in drawing electoral districts. Indeed, it makes race the only factor given that a political subdivision, such as the City,

must abandon its at-large system based on the existence of racially polarized voting and nothing more.

57. California does not have a compelling interest in requiring any political subdivision, including the City, to abandon its at-large system based on the existence of racially polarized voting and nothing more. The Supreme Court has assumed that there is a compelling interest in ensuring that minority voters are not denied the ability to form a compact district in which they will have the opportunity to elect a candidate of their choice. That is not the interest the CVRA advances. The CVRA seeks to maximize minority voting strength.

58. The CVRA also is not narrowly tailored to ensure that minority voters do not have their votes diluted because, among other reasons, it overrides the compactness precondition of Section 2 of the VRA. The California Legislature, in enacting the CVRA, thus lacked a strong basis in evidence to believe that it was necessary to override Section 2's compactness requirement in order to protect minorities from vote dilution.

59. As a consequence, the CVRA violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

60. Plaintiff has no adequate remedy at law other than the judicial relief sought here. The failure to enjoin the CVRA will irreparably harm Plaintiff by violating his constitutional rights.

## COSTS AND ATTORNEYS' FEES

61. Pursuant to 42 U.S.C. § 1988, Plaintiff seeks an award of their costs, including reasonable attorneys' fees, incurred in the litigation of this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

62. Declare that the California Voting Rights Act requires California political subdivisions, such as the City, to engage in racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment.

63. Permanently enjoin Defendant Becerra from enforcing or giving any effect to the California Voting Rights Act.
64. Declare Map 133 in violation of the Equal Protection Clause of the Fourteenth Amendment.
65. Permanently enjoin Defendant City of Poway from using Map 133 in any future election.

Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiff's attorneys' fees and reasonable costs.

Respectfully submitted,

/s/ *Bryan K. Weir*
Bryan K. Weir, CA Bar # 310964
William S. Consovoy, VA Bar # 47704 (*pro hac vice* to be filed)
Thomas R. McCarthy, VA Bar # 47154 (*pro hac vice* to be filed)
J. Michael Connolly, VA Bar # 77632 (*pro hac vice* to be filed)
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243-9423