1  Bryan K. Weir, CA Bar # 310964
2  William S. Consovoy, VA Bar # 47704 (*pro hac vice*)
   Thomas R. McCarthy, VA Bar # 47154 (*pro hac vice*)
3  J. Michael Connolly, VA Bar # 77632 (*pro hac vice*)
   CONSOVOY MCCARTHY PARK PLLC
4  3301 Wilson Boulevard, Suite 700
5  Arlington, VA 22201
   (703) 243-9423
6  bryan@consovoymccarthy.com
7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  DON HIGGINSON,                          Case No.:  3:17-cv-2032-WQH-JLB

12                           Plaintiff,     **MEMORANDUM OF POINTS AND**
                                            **AUTHORITIES IN SUPPORT OF**
13  v.                                      **PLAINTIFF'S NOTICE OF MOTION**
                                            **AND MOTION FOR PRELIMINARY**
14  XAVIER BECERRA, in his official         **INJUNCTION**
    capacity as ATTORNEY GENERAL OF
15  CALIFORNIA; and CITY OF POWAY,
16  CALIFORNIA,                             Judge: Hon. William Q. Hayes
                                            Date: November 20, 2017
17                          Defendants.
18                                          **No Oral Argument Unless Requested**
19                                          **by the Court.**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 2

    A.   Section 2 of the Voting Rights Act ................................................. 2

    B.   The California Voting Rights Act .................................................... 5

    C.   CVRA Enforcement Actions .......................................................... 8

    D.   The City of Poway ....................................................................... 10

LEGAL STANDARD ..................................................................................... 15

ARGUMENT ................................................................................................... 15

I.    Higginson is likely to succeed on the merits. .................................. 15

II.   The remaining preliminary-injunction factors warrant relief. ........... 17

    A.   Abridging the right to vote is *per se* irreparable harm. ................. 17

    B.   The public interest and balance of equities favor an injunction. ...... 19

CONCLUSION ................................................................................................ 23

CERTIFICATE OF SERVICE ........................................................................ 25

i

17cv2032

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abrams v. Johnson,*
   521 U.S. 74 (1997) ............................................................... 16

*Alliance for the Wild Rockies v. Pena,*
   865 F.3d 1211 (9th Cir. 2017) ............................................. 15

*Ariz. Democratic Party v. Ariz. Republican Party,*
   No. 16-cv-03752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ................... 17

*Arizona Dream Act Coal. v. Brewer,*
   757 F.3d 1053 (9th Cir. 2014) ............................................. 20

*Badham v. U.S. Dist. Court for N. Dist. of Cal.,*
   721 F.2d 1170 (9th Cir. 1983) ............................................. 18

*Bartlett v. Strickland,*
   556 U.S. 1 (2009) ............................................... 2, 3, 4, 16, 17

*Bernhardt v. Los Angeles County,*
   339 F.3d 920 (9th Cir. 2003) ............................................. 20

*Cardona v. Oakland Unified Sch. Dist., Cal.,*
   785 F. Supp. 837 (N.D. Cal. 1992) ...................................... 17, 23

*City of Greensboro v. Guilford County Bd. of Elections,*
   120 F. Supp. 3d 479 (M.D.N.C. 2015) ..................................... 18

*Cooper v. Harris,*
   137 S. Ct. 1455 (2017) .......................................... 1, 2, 4, 15, 16

*Council of Alternative Political Parties v. Hooks,*
   121 F.3d 876 (3d Cir. 1997) .............................................. 19

*Feldman v. Arizona Sec'y of State's Office,*
   843 F.3d 366 (9th Cir. 2016) (en banc) ................................. 22, 23

*Fish v. Kobach,*
   840 F.3d 710 (10th Cir. 2016) ............................................ 19

*Growe v. Emison,*
   507 U.S. 25 (1993) ............................................. 3, 4, 16, 17

ii

17cv2032

*Harman v. Forssenius,*
 380 U.S. 528 (1965) ............................................................................ 18

*Hunter v. Hamilton Cty. Bd. of Elections,*
 635 F.3d 219 (6th Cir. 2011) ............................................................... 20

*Jauregui v. City of Palmdale,*
 172 Cal. Rptr. 3d 333 (Cal. Ct. App. 2014) ......................................... 5

*Johnson v. De Grandy,*
 512 U.S. 997 (1994) .............................................................................. 4

*Johnson v. Miller,*
 929 F. Supp. 1529 (S.D. Ga. 1996) ..................................................... 19

*League of Women Voters of N.C. v. North Carolina,*
 769 F.3d 224 (4th Cir. 2014) ......................................... 17, 20, 21, 22

*Markham v. Fulton Cty. Bd. of Registrations & Elections,*
 No. 02-cv-111, 2002 WL 32587313 (N.D. Ga. May 29, 2002) ............. 22

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) ....................................................... 17, 20

*Miller v. Johnson,*
 515 U.S. 900 (1995) ........................................................................ 15, 16

*Obama for Am. v. Husted,*
 697 F.3d 423 (6th Cir. 2012) ................................................. 18, 20, 22

*Purcell v. Gonzalez,*
 549 U.S. 1 (2006) .................................................................................. 20

*Sanchez v. Cegavske,*
 214 F. Supp. 3d 961 (D. Nev. 2016) .................................................... 17

*Shaw v. Hunt,*
 517 U.S. 899 (1996) ......................................................................... 4, 15

*Shaw v. Reno,*
 509 U.S. 630 (1993) ............................................................................... 4

*Thornburg v. Gingles,*
 478 U.S. 30 (1986) ........................................................................... 3, 16

iii

17cv2032

*Valle del Sol, Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ................................................................ 20

*Wesberry v. Sanders,*
   376 U.S. 1 (1964) ..................................................................................... 18

*Williams v. Rhodes,*
   393 U.S. 23, 30 (1968) ............................................................................. 20

*Williams v. Salerno,*
   792 F.2d 323 (2d Cir. 1986) .................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..................................................................................... 15

**Statutes and Ordinances**

52 U.S.C. § 10301 ............................................................................... 2, 3, 6

Cal. Elec. Code § 10010 ......................................................................... 7, 8

Cal. Elec. Code § 10220 ........................................................................... 23

Cal. Elec. Code § 14026 ....................................................................... 6, 16

Cal. Elec. Code § 14027 ............................................................................. 6

Cal. Elec. Code § 14028 ....................................................................... 6, 16

Cal. Elec. Code § 14029 ............................................................................. 7

Cal. Elec. Code § 14030 ............................................................................. 7

Poway Ordinance § 2.04.080 ............................................................... 19, 23

Poway Ordinance § 2.24.010 ..................................................................... 23

**Articles**

Arlene Martinez, *Ventura Weighs Options in Voting Rights Challenge,*
   Ventura County Star (Oct 7, 2017) ......................................................... 10

Cara Jackson, *City Council Grapples with District-Based Elections,*
   Tehachapi News (Oct 13, 2017) .............................................................. 10

Dan Hutchings, *California Voting Rights Act Reform Spurs Collaboration,*
   Western City (Feb. 2017).......................................................................... 21

iv

17cv2032

Hayley Munguia, *Attorney Who Threatened to Sue Whittier City School District Will Allow More Time to Change Voting Maps*, Whittier Daily News (Oct. 11, 2017) .................................................................. 10

*Jackpot: Lawyers Earn Fees from Law They Wrote*, Associated Press (Nov. 16, 2009) ........................................................... 8, 9

Jean Merl, *Palmdale Officials Settle Lawsuit, Agree to Voting by District*, Los Angeles Times (May 6, 2015) ................................................... 9

Steve Scauzillo, *Lawyer to South Pasadena: Change the Way You Do Elections or Get Sued*, Pasadena Star-News (July 18, 2017) ............................................ 9

Thy Vo, *The Accidental Advocate*, Voice of OC (Sept 12, 2016) ............................................................ 9

## **Other Authorities**

Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) .......... 5

Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) ...................................................................... 5

Nicholas Heirdorn, *California Municipal Democracy Index 2016*, California Common Cause (Jan. 27, 2017) .......................................... 21

*The California Voting Rights Act and Districting: The Demographer's Perspective*, National Demographics Corporation (May 9, 2016) .................................. 10

v

**INTRODUCTION**

Plaintiff Don Higginson, a registered voter in Poway, California, seeks a preliminary injunction to enjoin the California Voting Rights Act ("CVRA") and the new districting plan it forced Poway to enact. The Equal Protection Clause of the Fourteenth Amendment "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017) (citation omitted). In passing the CVRA, the California legislature ignored this constitutional principle. The CVRA not only makes race the dominant consideration in redistricting—remarkably, it makes race the *only* factor. Thus, both the CVRA and the redistricting plan it imposed on Poway flagrantly violate the Fourteenth Amendment. Because this "race-based sorting of voters" neither serves a "compelling interest" nor is "narrowly tailored," *id.*, Higginson is likely to prevail on the merits of his equal-protection claim.

The remaining preliminary-injunction factors also warrant this relief. Impairment of a constitutional right is the paradigmatic irreparable harm, and infringement of the right to vote is among the most serious constitutional violations. Absent intervention, Poway will hold city council elections under a map that infringes not only Higginson's right to vote, but the voting rights of every Poway resident. That harm cannot be remedied at the end of the case. For these reasons, the balance of harms and public interest weigh in Higginson's favor too. There is no public interest in allowing the government to enforce a law that likely violates the Constitution.

The fact that the CVRA is wreaking havoc throughout the State makes the case for a preliminary relief that much stronger. As this case shows, the CVRA is putting California localities in an impossible situation. If these communities do not comply with the CVRA,

1

they will be sued for millions of dollars. But CVRA compliance forces them to engage in racial gerrymandering. This is a pressing issue for the dozens of cities that have been forced to switch to by-district elections and the hundreds of cities whose at-large voting systems place them at risk under the CVRA. Enjoining this unconstitutional statute thus is in the public interest. The Court should grant the motion.

**BACKGROUND**

### A. Section 2 of the Voting Rights Act

The Equal Protection Clause of the Fourteenth Amendment "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper*, 137 S. Ct. at 1463 (citation omitted). The Supreme Court has recognized that Section 2 of the Voting Rights Act of 1965 ("Section 2") is in tension with that constitutional command. To be sure, Congress enacted Section 2 to enforce the right to vote free from racial discrimination. Section 2 thus bars practices "imposed or applied ... in a manner which results in a denial or abridgment" of the right to vote. 52 U.S.C. § 10301(a) (formerly 42 U.S.C. § 1973). When Section 2 is invoked to remove racially-discriminatory voting restrictions, it uncontroversially enforces the Fourteenth Amendment.

But Section 2 also has been interpreted to protect minorities against vote dilution, and the Supreme Court has held that a municipality's use of multimember and at-large districts can, in some circumstances, "dilute[] minority voting strength by submerging [minority] voters into the white majority, denying them an opportunity to elect a candidate of their choice." *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality). This kind of violation "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision

2

are not equally open to participation by members of a class of citizens … in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Section 2's focus on ensuring minority groups can "elect representatives of their choice"—which *increases* the role of race in voting—raises serious constitutional concerns. *See Bartlett*, 556 U.S. at 21. As a consequence, the Supreme Court has tried to interpret the statute in a fashion that might keep it from violating the Equal Protection Clause's ban on racial gerrymandering.

Specifically, the Court has identified "three 'necessary preconditions' for a claim that the use of multimember [or at-large] districts constitute[s] actionable vote dilution under § 2: (1) The minority group must be 'sufficiently large and geographically compact to constitute a majority in a single-member district,' (2) the minority group must be 'politically cohesive,' and (3) the majority must vote 'sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.'" *Id*. (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). Under Section 2, "only when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." *Id*. at 11-12.

The Supreme Court has repeatedly emphasized the importance of the first *Gingles* factor—*i.e.*, that the minority group be sufficiently large and geographically compact to constitute a majority in a single-member district—in ensuring that Section 2 enforces the right to vote instead of requiring racial gerrymandering. The requirement is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993). "Without such a showing, 'there neither has been a wrong nor can be a remedy.'" *Bartlett*, 556 U.S. at 15

1    (quoting *Growe*, 507 U.S. at 41). Absent this requirement, in other words, Section 2 would

2    entitle "minority groups to the maximum possible voting strength," *id*. at 16, which "causes

3    its own dangers, and they are not to be courted," *Johnson v. De Grandy*, 512 U.S. 997,

4    1016 (1994).

5          The compactness requirement thus has been indispensable in saving Section 2 from

6    constitutional doubt. Section 2 undeniably makes race the predominant factor—even with

7    the compactness precondition in place—when it requires the creation of majority-minority

8    districts. *See Shaw v. Hunt*, 517 U.S. 899, 906-08 (1996) ("*Shaw II*"). The Supreme Court

9    has "assumed," but not held, "that one compelling interest is complying with operative

10   provisions of the Voting Rights Act of 1965." *Cooper*, 137 S. Ct. at 1464. But compliance

11   with Section 2 is "assumed" to be a compelling interest only because it is understood to

12   remedy racial discrimination in voting. *Bartlett*, 556 U.S. at 10. There is no racial

13   discrimination to remedy, however, if the minority population is not sufficiently "compact"

14   such that it would have "the potential to elect a representative of its own choice in some

15   single-member district." *Growe*, 507 U.S. at 40-41.

16         Furthermore, the use of race in districting must be narrowly tailored even assuming

17   the existence of a compelling interest. *Cooper*, 137 S. Ct. at 1464. Section 2 could never

18   meet that requirement absent the compactness precondition. "Racial gerrymandering, even

19   for remedial purposes, may balkanize us into competing racial factions; it threatens to carry

20   us further from the goal of a political system in which race no longer matters—a goal that

21   the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to

22   aspire." *Shaw v. Reno*, 509 U.S. 630, 657 (1993) ("*Shaw I*"). In short, eliminating the

23   compactness requirement would "unnecessarily infuse race into virtually every

24

25

26                                               4

27                                                                    _____

28                                                                    17cv2032

redistricting, raising serious constitutional questions." *Bartlett*, 556 U.S. at 21 (citation omitted).

### B. The California Voting Rights Act

The California Legislature was dissatisfied with the Supreme Court's interpretation of Section 2 and thought that it should "provide a broader basis for relief from vote dilution than available under the [VRA]." *Jauregui v. City of Palmdale*, 172 Cal. Rptr. 3d 333, 350 (Cal. Ct. App. 2014). The Legislature concluded that the Court's "[r]estrictive interpretations" of Section 2, which were adopted to try to avoid racial-gerrymandering concerns, were simply wrong. Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) as amended Apr. 9. 2002, p.2. Flouting the Supreme Court, the Legislature determined that "geographical compactness would not appear to be an important factor in assessing whether the voting rights of a minority group have been diluted or abridged by an at-large election system." *Id*. at 3.

The California Voting Rights Act of 2001 was enacted to "avoid that problem." *Id*. at 2. The CVRA therefore was designed to "make it easier to successfully challenge at-large districts" by eliminating the *Gingles* precondition that "a minority community be sufficiently concentrated geographically to create a district in which the minority community could elect its own candidate." Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended Jun. 11, 2002, p.4. The CVRA thus overrides the "[r]estrictive interpretations given to the [VRA]" by allowing a plaintiff to establish "[vote] dilution or abridgment of minority voting rights" merely "by showing the [other] two [*Gingles*] requirements." Assem. Com. on Judiciary, *supra*, at 2-3.

5

To that end, Section 14027 of the CVRA provides that "[a]n at-large method of election may not be imposed or applied in a manner that impairs the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election ... as a result of the dilution." Cal. Elec. Code § 14027. A "protected class" is defined as "a class of voters who are members of a race, color, or language minority group, as this class is referenced and defined in the federal Voting Rights Act of 1965." Cal. Elec. Code § 14026(d); *see* 52 U.S.C. § 10301, *et seq*. "A violation of Section 14027 is established if it is shown that racially polarized voting occurs in elections for members of the governing body of the political subdivision or in elections incorporating other electoral choices by the voters of the political subdivision," Cal. Elec. Code § 14028(a). "Racially polarized voting," in turn, means "voting in which there is a difference, as defined in case law regarding enforcement of the [VRA], in the choice of candidates or other electoral choices that are preferred by voters in a protected class, and in the choice of candidates and electoral choices that are preferred by voters in the rest of the electorate." Cal. Elec. Code § 14026(e).

Section 14028 thus makes clear that if racially polarized voting exists, no other showing is needed to establish a CVRA violation. Cal. Elec. Code § 14028(a). "The fact that members of a protected class are not geographically compact or concentrated may not preclude a finding of racially polarized voting, or a violation of Section 14027 and this section, but may be a factor in determining an appropriate remedy." Cal. Elec. Code § 14028(c). Moreover, "[p]roof of an intent on the part of the voters or elected officials to discriminate against a protected class is not required." Cal. Elec. Code § 14028(d). Factors "such as the history of discrimination ... are probative, but not necessary factors to establish

6

17cv2032

a violation of Section 14027 and this section." *Id*. § 14028(e). Once there is a finding of racially polarized voting, the political subdivision must abandon its at-large system. "Upon a finding of a violation of Section 14027 and Section 14028, the court shall implement appropriate remedies, including the imposition of district-based elections, that are tailored to remedy the violation." Cal. Elec. Code § 14029.

Importantly, no matter the remedy, the political subdivision will be liable for attorneys' fees and costs because it will have been found liable under the CVRA. "In any action to enforce Section 14027 and Section 14028, the court shall allow the prevailing plaintiff party, other than the state or political subdivision thereof, a reasonable attorney's fee, ... and litigation expenses including, but not limited to, expert witness fees and expenses as part of the costs. Prevailing defendant parties shall not recover any costs, unless the court finds the action to be frivolous, unreasonable, or without foundation." Cal. Elec. Code § 14030.

In 2016, the election code was amended to afford a political subdivision in violation of the CVRA a safe harbor from the expense of litigation. "Before commencing an action to enforce Sections 14027 and 14028, a prospective plaintiff shall send by certified mail a written notice to the clerk of the political subdivision against which the action would be brought asserting that the political subdivision's method of conducting elections may violate the California Voting Rights Act." Cal. Elec. Code § 10010(e)(1). "A prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 45 days of the political subdivision's receipt of the written notice described in paragraph (1)." *Id*. § 10010(e)(2).

The political subdivision then must decide whether it will comply with the demand or be sued under the CVRA. "Before receiving a written notice described in paragraph (1),

7

17cv2032

or within 45 days of receipt of a notice, a political subdivision may pass a resolution outlining its intention to transition from at-large to district-based elections, specific steps it will undertake to facilitate this transition, and an estimated time frame for doing so." Cal. Elec. Code § 10010(e)(3)(A). "If a political subdivision passes a resolution pursuant to subparagraph (A), a prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 90 days of the resolution's passage." *Id*. §10010(e)(3)(B). Thus, a political subdivision can limit its exposure under the CVRA only by quickly agreeing to abandon its at-large system and begin the process of transitioning to by-district elections. Only if the political subdivision capitulates, will the complaining party have his or her fees "capped at $30,000." Cal. Elec. Code § 10010(f)(3).

### C. CVRA Enforcement Actions

As noted above, the California Voting Rights Act was not drafted by concerned legislators in an effort to prevent racial discrimination; after all, the Fourteenth Amendment and Section 2 already accomplished that goal. The CVRA instead was "drafted mainly by Seattle law professor Joaquin Avila, with advice from lawyers including Robert Rubin, legal director for the Lawyers' Committee for Civil Rights of the San Francisco Bay Area." *Jackpot: Lawyers Earn Fees from Law They Wrote*, Associated Press (Nov. 16, 2009), https://goo.gl/3N9dn8. Their goal was to force California localities to maximize minority voting power and secure lucrative fee awards in the process. As the Associated Press reported in 2009, "[e]very lawsuit filed or even threatened under [the CVRA]—and all of the roughly $4.3 million from settlements so far—can be traced to just two people: a pair of attorneys who worked together writing the statute." *Id*. As of 2009, Avila, Rubin's committee, and the lawyers working with them had "collected or billed local governments about $4.3 million in three cases that settled," and were poised to "reap more from two

pending lawsuits." *Id*. The Associated Press found it "unusual that after seven years all legal efforts [were] so narrowly focused, especially since Avila told lawmakers when he testified for the bill in 2002 that he expected other attorneys would take on cases because of favorable incentives written into the measure." *Id*. As one elected official commented, the enterprise is nothing more than a "money grab." *Id*.

Eventually, other attorneys noticed the lucrative potential of the CVRA. One man, in particular—Kevin Shenkman—has been more prominent than any other attorney in utilizing the CVRA to reap private gains at the expense of California taxpayers. In 2011, Shenkman began bringing (or threatening to bring) CVRA suits against dozens of California cities. Thy Vo, *The Accidental Advocate*, Voice of OC (Sept 12, 2016), https://goo.gl/WfFnPD. He created, in his words, a "cottage industry" in which he was "taking advantage of easy targets." *Id*. While most cities folded to the pressure, one city, the City of Palmdale, fought back, standing up as the "lone holdout in a string of lawsuits filed against cities that resisted district voting." Jean Merl, *Palmdale Officials Settle Lawsuit, Agree to Voting by District*, Los Angeles Times (May 6, 2015), https://goo.gl/HtvYxY. But after enduring a three-year court battle and spending millions in attorney's fees, the City of Palmdale ultimately capitulated, agreeing to change from at-large to by-district elections and to pay Shenkman $4.5 million in attorney's fees. *Id*. Palmdale's total bill for the litigation ultimately rose to approximately $7 million. *See* Steve Scauzillo, *Lawyer to South Pasadena: Change the Way You Do Elections or Get Sued*, Pasadena Star-News (July 18, 2017), https://goo.gl/wMkB1M.

Since the Palmdale case, Shenkman has become increasingly aggressive in sending CVRA demand letters. They all follow the same formula—a letter from Shenkman threatening to sue if the city did not transition to by-district elections and a warning that

17cv2032

the city's failure to do so would lead to the same massive liability Palmdale suffered. One by one, the targeted cities have suffered staggering liability or preemptively surrendered. These include—just to name a few—Modesto ($3 million in fees); Anaheim ($1.2 million in fees); Whittier (over $1 million in fees); Santa Barbara ($600,000 in fees); Madera Unified (about $170,000 in fees); Costa Mesa ($55,000 in fees); Merced ($42,000 in fees); and Placentia ($20,000 in fees). *See The California Voting Rights Act and Districting: The Demographer's Perspective*, National Demographics Corporation at 5 (May 9, 2016), https://goo.gl/yY3Sgz. Indeed, numerous cities in California right now are facing similar dilemmas—engage in race-based gerrymandering or face massive liability under the CVRA. *See, e.g.,* Cara Jackson, *City Council Grapples with District-Based Elections*, Tehachapi News (Oct 13, 2017), https://goo.gl/cFrki4 (City of Tehachapi); Hayley Munguia, *Attorney Who Threatened to Sue Whittier City School District Will Allow More Time to Change Voting Maps*, Whittier Daily News (Oct. 11, 2017), https://goo.gl/MmChqk (Whittier City School District); Arlene Martinez, *Ventura Weighs Options in Voting Rights Challenge*, Ventura County Star (Oct 7, 2017), https://goo.gl/yRqWpK (City of Ventura).

### D. The City of Poway

Like many California localities, the City of Poway for decades used an at-large voting system to elect its City Council. On June 7, 2017, the City received a certified letter from Kevin Shenkman asserting that the City's at-large system violates the CVRA. Exhibit A, at 6-9. Shenkman asserted that "voting within Poway is racially polarized, resulting in minority vote dilution, and therefore Poway's at-large elections violate the [CVRA]." *Id.* at 6. He added that the CVRA is "different" from the VRA "in several key respects, as the [California] Legislature sought to remedy what it considered restrictive interpretations

10

17cv2032

given to the federal act." *Id.* at 7. "The California Legislature dispensed with the requirement in *Gingles* that a minority group demonstrate that it is sufficiently large and geographically compact to constitute a 'majority-minority district.' Rather, the CVRA requires only that a plaintiff show the existence of racially polarized voting to establish that an at-large method of election violates the CVRA, not the desirability of any particular remedy." *Id.*

According to Shenkman, "Poway's at-large system dilutes the ability of Latinos (a 'protected class') to elect candidates of their choice or otherwise influence the outcome of Poway's council elections." *Id.* at 8. Unless the City "voluntarily change[s] its at-large system of electing council members ... [he] will be forced to seek judicial relief." *Id.* at 9. He reminded the City that he had sued "the City of Palmdale for violating the CVRA," and that "[a]fter spending millions of dollars, a district-based remedy was ultimately imposed upon the Palmdale city council, with districts that combine all incumbents into one of the four districts." *Id.* at 8. Shenkman gave the City until July 21, 2017 to notify him whether it would come into compliance with the CVRA. *Id.* at 9.

On June 20, 2017, in response to the Shenkman letter, the City Council held a closed session to discuss the threatened CVRA litigation. *See* Exhibit B. As reported out by the City Attorney after the closed session, the City Council provided direction to staff to prepare a resolution of intention for establishing and implementing by-district elections for the City Council members to be presented for consideration at the July 18, 2017 City Council meeting. *Id*. In recommending the adoption of the resolution ahead of the July 18 meeting, the City Attorney explained that "the risks and costs associated with protracted CVRA litigation—particularly in light of results in all other cities that have fought to retain at-large voting—cannot be ignored. The public interest may ultimately be better served by

11

17cv2032

1  a by-district electoral system if converting to that system avoids significant attorneys' fees

2  and cost award." Exhibit A, at 3.

3      At the City Council meeting on July 18, an outside attorney the City hired to advise

4  it on the Shenkman letter outlined the difficulty in defending CVRA lawsuits. He provided

5  examples of prior attorney's fees awards under the CVRA and explained that "[t]he state

6  statutory scheme when it was adopted by the state legislature effectively removed burdens

7  of proof that exist under the federal Voting Rights Act. And what that effectively means is

8  that it is virtually impossible for governmental agencies to defend against lawsuits brought

9  under the CVRA. And that's in fact why you see cities throughout the State converting …

10  in the face of these demand letters." Weir Decl. ¶ 11(a)

11      Three citizens spoke during the public discussion portion of the meeting. The first

12  speaker, a long-time advocate for by-district elections, said "I thought we'd have to go

13  through the initiative process to make it happen. It's amazing what … one letter from a

14  lawyer can do." *Id.* ¶ 11(b). The second speaker supported change to the electoral process

15  in the City more generally but was not an advocate for by-district elections necessarily. *Id.*

16  ¶ 11(c). He stated: "I think what you are doing as far as changing to districts is not [the]

17  optimum but [] certainly will get rid of the problem of getting the lawsuit." *Id.* The third

18  speaker opposed a change to by-district elections but acknowledged to the City Council

19  that, due to the threatened lawsuit, "I understand you don't really have a choice here." *Id.*

20  ¶ 11(d).

21      Each member of the City Council then expressed his strong disapproval of the

22  changes that the CVRA was forcing the City to make. City councilmember Jim

23  Cunningham explained that "the [safe-harbor provision] is truly the shield … we are using

24  to avoid attorney's fees, and costs, and protracted litigation." *Id.* He then specifically

12

17cv2032

sought advice from the outside attorney on whether they were utilizing that provision correctly to avoid those burdens. *Id.* ¶ 11(e). City councilmember Dave Grosch explained that he supported by-district elections eight years ago. *Id.* ¶ 11(f). But his experience as an at-large councilmember where he serves and supports the entire community—and not just one district—convinced him that at-large elections were better. *Id.* In reference to Shenkman's letter, he added, "I really hate that the City is … being told to do this by someone who doesn't live in Poway" and made clear that the letter was the only reason the City was changing to by-district elections. *Id.*

City councilmember John Mullin asked the outside attorney, "If at some point in time, … somebody does succeed in challenging any or all of the portions of the act, would we … then have the option to revisit the decision to use district elections?" *Id.* ¶ 11(g). The attorney explained the City would be able to do so. *Id.* Councilmember Mullin concluded: "We've gone through denial, and we've gone through anger, and now we're into acceptance. So, to those of you in the audience who think that we should be fighting this, we concur, we were there awhile back as well. I have no illusions that this will lead to better government for our city. I'm pretty proud of the job we do as we are now constituted… . But having said all of that, again we have a gun to our heads and we have no choice." *Id.*

Deputy Mayor Barry Leonard said, "I get it. I hate it but I get it." *Id.* ¶ 11(h). He explained his view that "we respond to everybody in the City. We don't pick certain people in certain neighborhoods and say we'll treat them any differently. There is no evidence of that whatsoever. So, I feel like we're already being found guilty of something and we don't have a chance to prove our innocence. It's just the deck is stacked. So, rather than spend a million dollars of the taxpayers' money, we roll over to these bullies." *Id.* Mayor Steve

Vaus concluded, "I'll just echo that this council does a remarkable job [with at-large elections]. … But we've got to do what we've got to do. And job one is to protect the treasure of our constituents. And it's their money we'd be putting at risk [with litigation] and none of us are willing to do that." *Id.* ¶ 11(i).

The City Council adopted Resolution No. 17-046 setting forth its intention to transition from at-large to by-district elections, pursuant to Elections Code section 10010(e)(3)(A). *See* Exhibit C, at 2-3. The Resolution stated that after "the City [had] received a letter threatening action under the California Voting Rights Act," it had "determined that it is in the best interest of the City to move from its current at-large electoral system to a by-district election for members of the City Council, in furtherance of the purposes of California Voting Rights Act." *Id.* at 1.

On August 1, 2017, August 8, 2017, and August 18, 2017, the Council held meetings where it received public input on drawing new districts, consulted a demographer on how to draw new districts, and evaluated potential maps for the new districts. *See* Exhibit D, at 2-4, 7-8, 9-10. On August 31, 2017, the Council voted 5-0 to proceed with Map 133, an election plan that divides the City into four districts. *See* Exhibit E, at 3. On September 19, 2017, the Council introduced an ordinance for first reading and public comment that enacted Plan 133. *See* Exhibit F, at 2-4. For his part, councilmember Mullin reiterated his view that the City "went down this path with the full recognition that this was our only reasonable option. Never did I, nor do I now, believe that this will lead to better governance for our city. … I support the [proposed ordinance] because of a lack of choice and not because I think it's best for the City. … I'm still begrudgingly doing this." Weir Decl. ¶ 12(a). Mayor Vaus stated "[We] certainly don't … love the fact that we've been forced into this." *Id.* ¶ 12(b).

14

On October 3, 2017, the Council adopted the ordinance enacting Map 133. *See* Exhibit G. In voting for the ordinance, councilmember Mullin stated, "I don't want my affirmative vote on this item to be construed in any way as my support for this notion for district elections. … I will support the motion because we have no choice not because I think district elections are what's best for the city." Weir Decl. ¶ 13.

## LEGAL STANDARD

To obtain a preliminary injunction, a party ordinarily must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). If, however, the "'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied," then the plaintiff need only "show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merit." *Id.* (citations and quotations omitted). As explained below, a preliminary injunction is warranted here under either test.

## ARGUMENT

**I.     Higginson is likely to succeed on the merits.**

The Fourteenth Amendment prohibits "racial gerrymanders in legislative districting plans." *Cooper*, 137 S. Ct. at 1463. Therefore, "if racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Id.* at 1464; *see also Shaw II*, 517 U.S. at 907 ("[S]trict scrutiny applies when race is the 'predominant' consideration in drawing the district lines such that 'the legislature subordinates traditional race-neutral districting principles ... to racial considerations'" (quoting *Miller v. Johnson,* 515 U.S. 900,

15

17cv2032

916 (1995)). Once strict scrutiny is triggered, the burden "shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 137 S. Ct. at 1464.

Race predominated over other factors in the enactment of Map 133. Indeed, race was the *only* factor in the City's decisions to abandon its at-large voting system in favor of by-district elections. The City was required, as a matter of state law, to comply with the CVRA. The CVRA, in turn, commands California localities (including the City) to switch to by-district elections upon a showing of racially-polarized voting—period. In other words, the locality must redistrict strictly because individuals of one race tend to vote for one political party and individuals of another race tend to vote for the other political party. *See* Cal. Elec. Code §§ 14026(e), 14028(a); *Gingles*, 478 U.S. at 74. It is thus difficult to imagine a statute more dominated by racial considerations than the CVRA.

For Map 133 to withstand equal-protection review, then, the CVRA must pass strict scrutiny. But it cannot do so. First, California does not have a compelling interest in forcing localities to redistrict strictly because of the existence of racially-polarized voting. There may be a compelling interest in ensuring that "the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. But a statute that (unlike Section 2) focuses solely on racially-polarized voting does not pursue that anti-vote-dilution interest. The CVRA instead entitles "minority groups to the maximum possible voting strength." *Bartlett*, 556 U.S. at 16. Maximizing the voting power of minority groups is not a compelling interest. *See Miller*, 515 U.S. at 926; *Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997) (explaining that *Miller* held that the Department of Justice's "max-black policy" violated the Equal Protection clause because of its "entirely race-focused approach to redistricting").

16

Second, the CVRA is not narrowly tailored to remedy racial discrimination in voting. The CVRA eliminates Section 2's requirement that the minority group must be sufficiently "compact" such that it would have "the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. "Without such a showing, 'there neither has been a wrong nor can be a remedy.'" *Bartlett*, 556 U.S. at 15 (quoting *Growe*, 507 U.S. at 41). Eliminating the compactness requirement, in other words, is not narrowly tailored to eliminate discrimination in voting because it would "unnecessarily infuse race into virtually every redistricting." *Id.* at 21 (citation omitted). In sum, the Supreme Court has explained that Section 2 *might be* a narrowly-tailored remedy for racial discrimination in voting. A statute, like the CVRA, that overrides the constraints the Supreme Court has imposed on Section 2 to keep it from making race too dominant a factor in redistricting could never be narrow tailored.

## II.   The remaining preliminary-injunction factors warrant relief.

### A. Abridging the right to vote is *per se* irreparable harm.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). Constitutional violations in the context of voting cause the most grievous form of irreparable harm. *See, e.g.*, *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976 (D. Nev. 2016) ("It is clear that abridgement of the right to vote constitutes an irreparable injury."); *Ariz. Democratic Party v. Ariz. Republican Party*, No. 16-cv-03752, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016) (same); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely

17

17cv2032

deem restrictions on fundamental voting rights irreparable injury"); *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote … constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (holding that the plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon.").

The reason for this consensus is simple. "The right to vote is 'fundamental because it is preservative of all rights.'" *Badham v. U.S. Dist. Court for N. Dist. of Cal.*, 721 F.2d 1170, 1173 (9th Cir. 1983) (quoting *Harman v. Forssenius*, 380 U.S. 528, 537 (1965)). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). As a result, delay in cases like this are "particularly insidious" because "the courts' failure to act before the next election forces voters to vote in an election which may be constitutionally defective." *Id.*; *see, e.g.*, *City of Greensboro v. Guilford County Bd. of Elections*, 120 F. Supp. 3d 479, 490 (M.D.N.C. 2015) ("[I]f the Court does not enter an injunction, it would mean that the City Council would be elected in a manner that is likely to be unconstitutional, to the harm of individual voters. If no injunction is entered and the plaintiffs ultimately win, the plaintiffs will have been deprived of their equal protection rights during the 2015 election cycle. That is not a deprivation that can be remedied."). And officials winning such elections "may acquire advantages of incumbency that may be difficult for their opponents to overcome in future elections held under a constitutionally valid plan." *Badham*, 721 F.2d at 1173.

That bedrock principle applies no differently here. As explained, the City's switch from at-large to by-district voting violates Higginson's (and every other Poway voter's) Fourteenth Amendment rights because the decision was driven exclusively by race. Permitting such a constitutional violation clearly would result in irreparable harm. *See, e.g.*,

*Johnson v. Miller*, 929 F. Supp. 1529, 1560 (S.D. Ga. 1996) ("Having found that Plaintiffs have shown a substantial likelihood of success on the merits of their claim that parts of the 1992 plan violate the Equal Protection Clause, …. [w]e find irreparable harm in its purest sense will be occasioned by denying this preliminary injunction and by permitting use of a plan violating Plaintiffs' equal protection rights. Plaintiffs, indeed all citizens of Georgia, should not be denied their right to a constitutional districting plan.").

Moreover, before the switch, Higginson could vote for all four councilmembers, and, in fact, had regularly done so since 1986. *See* Higginson Decl. ¶¶ 7-8. Ordinance 809 takes away three of those votes. Indeed, Ordinance 809 replaced the November 2018 at-large election with one for councilmembers of District 1 and District 3 only. Exhibit G, at 3-4 *to be codified at* Poway Ordinance § 2.04.080. Higginson will no longer be able to vote in that election because he is a resident of District 2. *Id.* (setting the District 2 election for 2020); Higginson Decl. ¶ 3. That is plainly an abridgement of his right to vote. *See, e.g.*, *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (finding irreparable injury because "[p]laintiffs' voting and associational rights are burdened by their inability to nominate, support, and vote for candidates who represent their beliefs"). And because "this infringement … cannot be alleviated after the election," *id.*, irreparable injury is established, *see also Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("Because there can be no 'do-over' or redress of a denial of the right to vote after an election, denial of that right weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction.").

### B. The public interest and balance of equities favor an injunction.

"[By] establishing a likelihood that Defendants' policy violates the U.S. Constitution," Higginson has "also established that both the public interest and the balance

19

17cv2032

of the equities favor a preliminary injunction." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (reversing district court's refusal to enter an injunction for violations of the Equal Protection Clause). As the Ninth Circuit has explained, "it is clear that it would not be equitable or in the public's interest to allow the state ... to violate the requirements of federal law, especially when there are no adequate remedies available." *Id.* (quoting *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). That is why "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (citation omitted).

This is doubly true where there are constitutional violations involving voting. "[T]he right of qualified voters, regardless of their political persuasion, to cast their votes … rank[s] among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). For that reason, "[m]embers of the public … have a 'strong interest in exercising the fundamental political right to vote.'" *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). And "[t]hat interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Id.*; *see also Obama for America*, 697 F.3d at 436-37 (same).

This is particularly true here because the CVRA's impact extends far beyond just Higginson's right to vote. "The public interest inquiry primarily addresses impact on non-parties rather than the parties." *Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir. 2003) (citation omitted). To start, the most important non-parties in this case are the estimated 35,000 other Poway voters who will suffer the same irreparable injury as Higginson. *See* Exhibit H. Because "'[t]he public interest ... favors permitting as many qualified voters to vote as possible,'" *League of Women Voters*, 769 F.3d at 247-48

17cv2032

1  (citation omitted), the need to ensure that every eligible Poway citizen can cast a vote for

2  all four councilmembers strongly supports an injunction.

3      If that were not enough, Poway's voters are just a small sub-set of the non-parties

4  whose constitutional rights the CVRA violates. "Private law firms have turned CVRA

5  litigation into a cottage industry." Dan Hutchings, *California Voting Rights Act Reform*

6  *Spurs Collaboration*, Western City (Feb. 2017), https://goo.gl/DRzYyL. "Since 2010,

7  there have been a surge in lawsuits specifically targeting cities that have resulted in many

8  cities converting to district-based elections." *Id.* "[I]n just the past five years the number of

9  cities using by-district elections has more than doubled from 29 to 59, with an additional

10  15 cities set to use by-district elections by 2018. Most of the dramatic growth in by-district

11  elections has been a result of litigation, or the threat of litigation, under the California

12  Voting Rights Act of 2001." Nicholas Heirdorn, *California Municipal Democracy Index*

13  *2016*, California Common Cause, at 49 (Jan. 27, 2017), https://goo.gl/LcJCN3. Indeed, of

14  the 74 cities that will have by-district voting in 2018, 45 of them (61%) switched from at-

15  large voting in the last five years. *See id.* As with Higginson, the CVRA is violating all of

16  these California voters' equal-protection rights.

17      And this is only the beginning. These lawyers have plenty of future targets. In 2016,

18  there were 415 California cities (86%) using at-large voting. *Id.* Absent an injunction, then,

19  voters in all of those localities remain at risk of suffering Higginson's fate. Put differently,

20  an injunction here would protect the rights of millions of California voters. "The public

21  interest thus weighs heavily in [Higginson]'s favor." *League of Women Voters*, 769 F.3d

22  at 248.

23      Finally, an injunction will not cause Poway or other California localities any burden

24  that would weigh in favor of denying preliminary injunctive relief. There is *no* burden for

17cv2032

those localities that currently have at-large elections and are not in the process of switching to by-district voting. An injunction for them simply preserves the *status quo*. So too for Poway. Ordinance 809 does not go into effect until November 2. *See* Exhibit G, at 4. The *status quo* today is at-large elections. But at-large elections remain the *status quo* even after November 2. "Every other election cycle" in Poway has been with one at-large district; an injunction would thus "restore[] the *status quo ante* to the disruption created by the [CVRA] that is affecting this election cycle for the first time." *Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 376 (9th Cir. 2016) (en banc). If anything, granting the preliminary injunction would give Poway the certainty that it will not have to devote time and expense to scheduling by-district elections that ultimately will be invalidated under the Equal Protection Clause.

Indeed, the requested injunction as to Poway is minor and would not alter the city's election procedures at all. Higginson does not ask the Court to wade into the complexities of drawing a new map. *See, e.g.*, *Markham v. Fulton Cty. Bd. of Registrations & Elections*, No. 02-cv-111, 2002 WL 32587313, at *5 (N.D. Ga. May 29, 2002). He asks only that the Court enjoin the use of by-district voting (*i.e.*, Map 133) because the decision to move to that method was motivated solely by race. The remedy is simply to return Poway to at-large districts during the pendency of this litigation, which would require that Poway conduct its elections in precisely the way it always has. In other words, the voting "systems have existed, do exist, and simply need to be resurrected." *League of Women Voters*, 769 F.3d at 248; *see also Obama for America*, 697 F.3d at 436 (explaining an injunction reverting to former practice was no "burden on the State" because the election boards had "successfully" executed that practice before).

22

17cv2032

Moreover, there is no risk of the Court unduly interfering on the eve of an election. The next municipal election in Poway is not until November 6, 2018. *See* Poway Ordinance § 2.24.010 ("[T]he general election for the City shall be held on the same day as the day of the statewide general election."); Exhibit G, at 3-4, *to be codified at* Poway Ordinance § 2.04.080. Nominations for that election will not even begin until nine months from now on July 16, 2018. *See* Cal. Elec. Code § 10220 (barring municipalities from opening nominations more than 133 days before election day). Higginson is therefore not asking the Court to interfere when "election machinery is already in gear." *Cardona*, 785 F. Supp. at 843. He has avoided that problem by filing this lawsuit the day after Poway adopted Ordinance 809. *See id.* (faulting the plaintiffs for waiting almost a year to seek a preliminary injunction). In sum, there is no risk that an injunction would "confuse election officials or deter people from going to the polls ... . The election process is unaffected." *Feldman*, 843 F.3d at 368.

## CONCLUSION

For the foregoing reasons, the Court should grant Higginson's Motion for a Preliminary Injunction and temporarily enjoin, for the pendency of this action, Defendant Attorney General Xavier Becerra and his agents from enforcing the California Voting Rights Act and Defendant City of Poway from using Map 133 for future elections.

Dated: October 19, 2017          Respectfully submitted,

/s/ *Bryan K. Weir*
Bryan K. Weir, CA Bar # 310964
William S. Consovoy, VA Bar # 47704 (*pro hac vice*)
Thomas R. McCarthy, VA Bar # 47154 (*pro hac vice*)
J. Michael Connolly, VA Bar # 77632 (*pro hac vice*)
CONSOVOY MCCARTHY PARK PLLC

23

3301 Wilson Boulevard, Suite 700
Arlington, VA 22201
bryan@consovoymccarthy.com
(703) 243-9423

24

17cv2032

**CERTIFICATE OF SERVICE**

I hereby certify that today I served this pleading and the attached declarations and exhibits on defendants' counsel listed below via email, as consented to by the parties under Federal Rule of Civil Procedure 5 and Local Civil Rule 5.2. *See* Fed. R. Civ. P. 5(b)(2)(D)-(E).

| | |
|---|---|
| John A. Ramirez | Amie L. Medley |
| RUTAN & TUCKER, LLP | Deputy Attorney General of California |
| 611 Anton Boulevard | 300 South Spring Street |
| Suite 1400 | Suite 1702 |
| Costa Mesa California 92626-1931 | Los Angeles, CA 90013 |
| (714) 662-4610 | (213) 897-7476 |
| JRamirez@rutan.com | Amie.Medley@doj.ca.gov |

*Counsel for Defendant City of Poway*   *Counsel for Defendant Attorney General of California Xavier Becerra*

Dated: October 19, 2017

/s/ Bryan K. Weir
Bryan K. Weir
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
bryan@consovoymccarthy.com
(703) 243-9423

25

17cv2032