Bryan K. Weir, CA Bar # 310964
William S. Consovoy, VA Bar # 47704 (*pro hac vice*)
Thomas R. McCarthy, VA Bar # 47154 (*pro hac vice*)
J. Michael Connolly, VA Bar # 77632 (*pro hac vice*)
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
bryan@consovoymccarthy.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DON HIGGINSON,

                                  Plaintiff,

v.

XAVIER BECERRA, in his official
capacity as ATTORNEY GENERAL OF
CALIFORNIA; and CITY OF POWAY,
CALIFORNIA,

                                  Defendants.

Case No. 3:17-cv-2032-WQH-JLB

**OPPOSITION TO MOTION TO DISMISS**

Judge: Hon. William Q. Hayes
Date:  September 10, 2018

**No Oral Argument Unless Requested by the Court.**

17cv2032

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

   A.  Section 2 of the Voting Rights Act ................................................................. 1

   B.  The California Voting Rights Act .................................................................... 4

   C.  CVRA Enforcement Actions ........................................................................... 7

   D.  The City of Poway Abandons At-Large Districts To Avoid CVRA Liability. ......... 9

   E.  Procedural History .......................................................................................... 13

STANDARD OF REVIEW ............................................................................................ 13

ARGUMENT ................................................................................................................. 14

I. HIGGINSON HAS STATED A CLAIM FOR RELIEF UNDER
THE FOURTEENTH AMENDMENT. ..................................................................... 14

   A.  Higginson Alleges a Cognizable Claim under the Fourteenth Amendment ........... 14

   B.  Higginson Is Challenging the Constitutionality of His District, Which Was
Drawn Solely To Comply With the CVRA's Race-Based Mandates. ................... 15

   C.  The CVRA Is Not a Race-Neutral Statute. .................................................... 18

   D.  Higginson Has Stated a Claim for a Facial Challenge to the CVRA. .............. 21

CONCLUSION .............................................................................................................. 22

CERTIFICATE OF SERVICE ...................................................................................... 23

i

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Johnson,*
    521 U.S. 74 (1997)...................................................................................18

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)................................................................................14

*Alabama Legislative Black Caucus v. Alabama,*
    135 S. Ct. 1257 (2015)...........................................................................21

*Allen v. State Bd. of Elections,*
    393 U.S. 544 (1969)................................................................................16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................13

*Barnum Timber Co. v. EPA,*
    633 F.3d 894 (9th Cir. 2011) ................................................................13

*Bartlett v. Strickland,*
    556 U.S. 1 (2009)...............................................2, 3, 18, 19, 20, 21, 22

*Bennett v. Spear,*
    520 U.S. 154 (1997)................................................................................15

*Bethune-Hill v. Virginia State Bd. of Elections,*
    137 S. Ct. 788 (2017).............................................................................22

*Burbank-Glendale-Pasadena Airport Authority v. City of Burbank,*
    136 F.3d 1360 (9th Cir. 1998) ..............................................................16

*City of Los Angeles, Calif. v. Patel,*
    135 S. Ct. 2443 (2015)...........................................................................24

*City of Waukesha v. EPA,*
    320 F.3d 228, 235 (D.C. Cir. 2003) .....................................................13

*Cooper v. Harris,*
    137 S. Ct. 1455 (2017).........................1, 2, 3, 4, 18, 19, 20, 21, 22

*Direct List LLC v. Vistage Int'l, Inc.,*
    No. 15-cv-2025, 2016 WL 6523322 (S.D. Cal. Nov. 3, 2016)...................13

*Ex Parte Young,*
    209 U.S. 123 (1908)................................................................................15

*Federal Election Com'n v. Akins,*
    524 U.S. 11 (1998)..................................................................................17

ii

*Feldman v. Bomar*,
   518 F.3d 637 (9th Cir. 2008) ...................................................................16

*Georgia v. Ashcroft*,
   539 U.S. 461 (2003)............................................................................... 2

*Gomez v. City of Watsonville*,
   863 F.2d 1407 (9th Cir. 1988)..................................................................23

*Growe v. Emison*,
   507 U.S. 25 (1993)........................................................................3, 4, 18, 19, 20

*Hoye v. City of Oakland*,
   653 F.3d 835 (9th Cir. 2011) ...................................................................25

*Jauregui v. City of Palmdale*,
   172 Cal. Rptr. 3d 333 (Cal. Ct. App. 2014) ................................................4

*Johnson v. California*,
   543 U.S. 499 (2005)................................................................................23

*Johnson v. De Grandy*,
   512 U.S. 997 (1993)...........................................................................3, 20

*Lazar v. Kroncke*,
   862 F.3d 1186 (9th Cir. 2017) .................................................................13

*LULAC v. City of Boerne*,
   659 F.3d 421 (5th Cir. 2011) .........................................................15, 16, 21

*LULAC v. Perry*,
   548 U.S. 399 (2006).................................................................................20

*Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*,
   237 F.3d 1101 (9th Cir. 2001) .................................................................17

*Mendia v. Garcia*,
   768 F.3d 1009 (9th Cir. 2014) .................................................................15

*Miller v. Johnson*,
   515 U.S. 900 (1995)...........................................................................2, 18

*Powers v. Ohio*,
   499 U.S. 400 (1991).................................................................................23

*Pride v. Correa*,
   719 F.3d 1130 (9th Cir. 2013) .................................................................13

*Rhoades v. Avon Products, Inc.*,
   504 F.3d 1151 (9th Cir. 2007) .................................................................16

iii

*Sanchez v. City of Modesto*,
  51 Cal. Rptr. 3d 821 (Cal. Ct. App. 2006) ...................................................23

*Shaw v. Hunt*,
  517 U.S. 899 (1996) .........................................................................................3

*Shaw v. Reno*,
  509 U.S. 630 (1993) .......................................................................4, 14, 20, 23

*Shelby County, Ala. v. Holder*,
  133 S. Ct. 2612 (2013) ...................................................................................17

*Sinkfield v. Kelley*,
  531 U.S. 28 (2000) .........................................................................................14

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ...................................................................................13

*Sylvia Development Corp. v. Calvert County, Md.*,
  48 F.3d 810 (4th Cir. 1995) ...........................................................................22

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ...........................................................................3, 18, 23

*United States v. Hays*,
  515 U.S. 737 (1995) ...............................................................................14, 20

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) .......................................................................13

**Statutes and Rules**

42 U.S.C. § 1983 .................................................................................................17

52 U.S.C. § 10301 ..........................................................................................2, 24

Cal. Elec. Code § 10010 ...............................................................................6, 7

Cal. Elec. Code § 14026 .........................................................................5, 18, 23

Cal. Elec. Code § 14027 ..............................................................................5, 24

Cal. Elec. Code § 14028 .........................................................................5, 6, 18

Cal. Elec. Code § 14029 .....................................................................................6

Cal. Elec. Code § 14030 .....................................................................................6

Fed. R. Civ. P. 12(b)(1) ...................................................................................13

Fed. R. Civ. P. 12(b)(6) ...................................................................................13

iv

1

## **Other Authorities**

2

Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976
   (2001-2002 Reg. Sess.) as amended Apr. 9. 2002 ...................................4, 5

3

Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976
   (2001–2002 Reg. Sess.) as amended Jun. 11, 2002 ...................................5

4

Arlene Martinez, *Ventura Weighs Options in Voting Rights Challenge*,
   Ventura County Star (Oct 7, 2017) ...................................9

5

Cara Jackson, *City Council Grapples with District-Based Elections*,
   Tehachapi News (Oct 13, 2017) ...................................9

6

Hayley Munguia, *Attorney Who Threatened to Sue Whittier City School District Will
   Allow More Time to Change Voting Maps*,
   Whittier Daily News (Oct. 11, 2017) ...................................9

7

*Jackpot: Lawyers Earn Fees from Law They Wrote*,
   Associated Press (Nov. 16, 2009) ...................................7

8

Jean Merl, *Palmdale Officials Settle Lawsuit, Agree to Voting by District*,
   Los Angeles Times (May 6, 2015) ...................................8

9

Steve Scauzillo, *Lawyer to South Pasadena: Change the Way You Do Elections or Get
   Sued*, Pasadena Star-News (July 18, 2017) ...................................8

10

*The California Voting Rights Act and Districting: The Demographer's Perspective*,
   National Demographics Corporation (May 9, 2016) ...................................8

11

Thy Vo, *The Accidental Advocate*,
   Voice of OC (Sept 12, 2016) ...................................8

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The California Voting Rights Act ("CVRA") imposes liability on cities that have "racially polarized voting." Fearing liability under the CVRA, the City of Poway abandoned its decades-old, at-large electoral system and adopted a by-district system (Map 133) to elect its city councilmembers. Don Higginson is a Poway voter who seeks a declaration that the CVRA and Map 133 violate the Fourteenth Amendment and an injunction prohibiting the Attorney General from enforcing the CVRA and the City from using Map 133 in future elections. The City has answered the complaint and taken a neutral position in this lawsuit, refusing to defend the constitutionality of the CVRA.

The Attorney General, however, seeks to dismiss the complaint on the basis that Higginson has failed to state a claim upon which relief can be granted. That argument fails, as Higginson has stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment. The Equal Protection Clause "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017) (citation omitted). The California legislature ignored that constitutional principle in passing the CVRA. The CVRA not only makes race the dominant consideration in redistricting—remarkably, it makes race the *only* factor. If voters of different races tend to vote for different candidates, then a city may not use at-large elections, full stop. Both the CVRA and the redistricting plan it forced Poway to adopt flagrantly violate the Fourteenth Amendment because this "race-based sorting of voters" neither serves a "compelling interest" nor is "narrowly tailored." The Attorney General's motion to dismiss should be denied.

**BACKGROUND**

**A.    Section 2 of the Voting Rights Act**

The Equal Protection Clause of the Fourteenth Amendment "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper*, 137 S. Ct. at 1463 (citation omitted). The Supreme Court has recognized that Section 2 of the Voting Rights Act of 1965 ("Section

1

2") is in tension with that constitutional command. *See, e.g., Miller v. Johnson*, 515 U.S. 900, 927-28 (1995); *see also Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring). Section 2 bars practices "imposed or applied ... in a manner which results in a denial or abridgment" of the right to vote. 52 U.S.C. § 10301(a) (formerly 42 U.S.C. § 1973). When Section 2 is invoked to remove racially-discriminatory voting restrictions, it uncontroversially enforces the Fourteenth Amendment.

But Section 2 also has been interpreted to protect minority groups against "vote dilution." The Supreme Court has held that a municipality's use of multi-member and at-large districts can, in some circumstances, "dilute[] minority voting strength by submerging [minority] voters into the white majority, denying them an opportunity to elect a candidate of their choice." *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality). This kind of violation "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens … in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Section 2's focus on ensuring that minority groups can "elect representatives of their choice"—which *increases* the role of race in voting—raises serious constitutional concerns. *See Bartlett*, 556 U.S. at 21 (plurality). As a consequence, the Supreme Court has interpreted the statute in a fashion that might keep it from violating the Equal Protection Clause's ban on racial gerrymandering.

Specifically, the Court has identified "three 'necessary preconditions' for a claim that the use of multimember [or at-large] districts constitute[s] actionable vote dilution under § 2: (1) The minority group must be 'sufficiently large and geographically compact to constitute a majority in a single-member district,' (2) the minority group must be 'politically cohesive,' and (3) the majority must vote 'sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.'" *Id*. (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). Under Section 2, "only when a party has established the

2

*Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." *Id*. at 11-12.

The Supreme Court has repeatedly emphasized the importance of the first *Gingles* factor—*i.e.*, that the minority group be sufficiently large and geographically compact to constitute a majority in a single-member district—in ensuring that Section 2 enforces the right to vote instead of requiring racial gerrymandering. The requirement is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993). "Without such a showing, 'there neither has been a wrong nor can be a remedy.'" *Bartlett*, 556 U.S. at 15 (plurality) (quoting *Growe*, 507 U.S. at 41). Absent this requirement, in other words, Section 2 would entitle "minority groups to the maximum possible voting strength," *id*. at 16, which "causes its own dangers, and they are not to be courted," *Johnson v. De Grandy*, 512 U.S. 997, 1016 (1994).

The compactness requirement has thus been indispensable in saving Section 2 from constitutional doubt. Section 2 undeniably makes race the predominant factor—even with the compactness precondition in place—when it requires the creation of majority-minority districts. *See Shaw v. Hunt*, 517 U.S. 899, 906-08 (1996) ("*Shaw II*"). The Supreme Court has "assumed," but not held, "that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965." *Cooper*, 137 S. Ct. at 1464. But compliance with Section 2 is "assumed" to be a compelling interest only because it is understood to remedy racial discrimination in voting. *Bartlett*, 556 U.S. at 10 (plurality). There is no racial discrimination to remedy, however, if the minority population is not sufficiently "compact" such that it would have "the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40-41.

Furthermore, the use of race in districting must be narrowly tailored even assuming the existence of a compelling interest. *Cooper*, 137 S. Ct. at 1464. Section 2 could never meet that requirement absent the compactness precondition. "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens

to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Shaw v. Reno*, 509 U.S. 630, 657 (1993) ("*Shaw I*"). In short, eliminating the compactness requirement would "unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Bartlett*, 556 U.S. at 21 (plurality) (citation omitted).

## B.   The California Voting Rights Act

The California Legislature was dissatisfied with the Supreme Court's interpretation of Section 2 and thought that it should "provide a broader basis for relief from vote dilution than available under the [FVRA]." *Jauregui v. City of Palmdale*, 172 Cal. Rptr. 3d 333, 350 (Cal. Ct. App. 2014). The Legislature concluded that the Court's "[r]estrictive interpretations" of Section 2, which were adopted to try to avoid racial-gerrymandering concerns, were simply wrong." Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) as amended Apr. 9. 2002, p.2. Paying no heed to the Supreme Court's repeated warnings about the constitutional concerns with Section 2, the Legislature determined that "geographical compactness would not appear to be an important factor in assessing whether the voting rights of a minority group have been diluted or abridged by an at-large election system." *Id.* at 3.

The California Voting Rights Act of 2001 was enacted to "avoid that problem." *Id.* at 2. The CVRA therefore was designed to "make it easier to successfully challenge at-large districts" by eliminating the *Gingles* precondition that "a minority community be sufficiently concentrated geographically to create a district in which the minority community could elect its own candidate." Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended Jun. 11, 2002, p.4. The CVRA thus overrides the "[r]estrictive interpretations given to the [FVRA]" by allowing a plaintiff to establish "[vote] dilution or abridgment of minority voting rights" merely "by showing the [other] two [*Gingles*] requirements." Assem. Com. on Judiciary, *supra*, at 2-3.

To that end, Section 14027 of the CVRA provides that "[a]n at-large method of election may not be imposed or applied in a manner that impairs the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election ... as a result of the dilution." Cal. Elec. Code § 14027. A "protected class" is defined as "a class of voters who are members of a race, color, or language minority group, as this class is referenced and defined in the federal Voting Rights Act of 1965." Cal. Elec. Code § 14026(d); *see* 52 U.S.C. § 10301, *et seq*. "A violation of Section 14027 is established if it is shown that racially polarized voting occurs in elections for members of the governing body of the political subdivision or in elections incorporating other electoral choices by the voters of the political subdivision," Cal. Elec. Code § 14028(a). "Racially polarized voting," in turn, means "voting in which there is a difference, as defined in case law regarding enforcement of the [FVRA], in the choice of candidates or other electoral choices that are preferred by voters in a protected class, and in the choice of candidates and electoral choices that are preferred by voters in the rest of the electorate." Cal. Elec. Code § 14026(e).

Section 14028 thus makes clear that if racially polarized voting exists, no other showing is needed to establish a CVRA violation. Cal. Elec. Code § 14028(a). "The fact that members of a protected class are not geographically compact or concentrated may not preclude a finding of racially polarized voting, or a violation of Section 14027 and this section, but may be a factor in determining an appropriate remedy." Cal. Elec. Code § 14028(c). Moreover, "[p]roof of an intent on the part of the voters or elected officials to discriminate against a protected class is not required." Cal. Elec. Code § 14028(d). Factors "such as the history of discrimination ... are probative, but not necessary factors to establish a violation of Section 14027 and this section." *Id*. § 14028(e). Once there is a finding of racially polarized voting, the political subdivision must abandon its at-large system. "Upon a finding of a violation of Section 14027 and Section 14028, the court shall implement appropriate remedies, including the imposition of district-based elections, that are tailored to remedy the violation." Cal. Elec. Code § 14029.

Importantly, no matter the remedy, the political subdivision will be liable for attorneys' fees and costs because it will have been found liable under the CVRA. "In any action to enforce Section 14027 and Section 14028, the court shall allow the prevailing plaintiff party, other than the state or political subdivision thereof, a reasonable attorney's fee, ... and litigation expenses including, but not limited to, expert witness fees and expenses as part of the costs. Prevailing defendant parties shall not recover any costs, unless the court finds the action to be frivolous, unreasonable, or without foundation." Cal. Elec. Code § 14030.

In 2016, the election code was amended to afford a political subdivision in violation of the CVRA a safe harbor from the expense of litigation. "Before commencing an action to enforce Sections 14027 and 14028, a prospective plaintiff shall send by certified mail a written notice to the clerk of the political subdivision against which the action would be brought asserting that the political subdivision's method of conducting elections may violate the California Voting Rights Act." Cal. Elec. Code § 10010(e)(1). "A prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 45 days of the political subdivision's receipt of the written notice described in paragraph (1)." *Id*. § 10010(e)(2).

The political subdivision then must decide whether it will comply with the demand or be sued under the CVRA. "Before receiving a written notice described in paragraph (1), or within 45 days of receipt of a notice, a political subdivision may pass a resolution outlining its intention to transition from at-large to district-based elections, specific steps it will undertake to facilitate this transition, and an estimated time frame for doing so." Cal. Elec. Code § 10010(e)(3)(A). "If a political subdivision passes a resolution pursuant to subparagraph (A), a prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 90 days of the resolution's passage." *Id*. §10010(e)(3)(B). Thus, a political subdivision can limit its exposure under the CVRA only by quickly agreeing to abandon its at-large system and begin the process of transitioning to by-district elections. Only if the political subdivision capitulates, will the

6

complaining party have his or her fees "capped at $30,000." Cal. Elec. Code § 10010(f)(3).

### C.    CVRA Enforcement Actions

The California Voting Rights Act was not drafted by concerned legislators in an effort to prevent racial discrimination; after all, the Fourteenth Amendment and Section 2 already exist to address that precise issue on a nationwide basis. The CVRA instead was "drafted mainly by Seattle law professor Joaquin Avila, with advice from lawyers including Robert Rubin, legal director for the Lawyers' Committee for Civil Rights of the San Francisco Bay Area." *Jackpot: Lawyers Earn Fees from Law They Wrote*, Associated Press (Nov. 16, 2009), https://goo.gl/3N9dn8. Their goal was to force California localities to maximize minority voting power and secure lucrative fee awards in the process.

As the Associated Press reported in 2009, "[e]very lawsuit filed or even threatened under [the CVRA]—and all of the roughly $4.3 million from settlements so far—can be traced to just two people: a pair of attorneys who worked together writing the statute." *Id*. As of 2009, Avila, Rubin's committee, and the lawyers working with them had "collected or billed local governments about $4.3 million in three cases that settled," and were poised to "reap more from two pending lawsuits." *Id*. The Associated Press found it "unusual that after seven years all legal efforts [were] so narrowly focused, especially since Avila told lawmakers when he testified for the bill in 2002 that he expected other attorneys would take on cases because of favorable incentives written into the measure." *Id*. As one elected official commented, the enterprise is nothing more than a "money grab." *Id*.

Eventually, other attorneys noticed the lucrative potential of the CVRA. One man, in particular—Kevin Shenkman—has been more prominent than any other attorney in utilizing the CVRA to reap private gains at the expense of California taxpayers. In 2011, Shenkman began bringing (or threatening to bring) CVRA suits against dozens of California cities. Thy Vo, *The Accidental Advocate*, Voice of OC (Sept 12, 2016), https://goo.gl/WfFnPD. He created, in his words, a "cottage industry" in which he was

"taking advantage of easy targets." *Id.* While most cities folded to the pressure, one city, the City of Palmdale, fought back, standing up as the "lone holdout in a string of lawsuits filed against cities that resisted district voting." Jean Merl, *Palmdale Officials Settle Lawsuit, Agree to Voting by District*, Los Angeles Times (May 6, 2015), https://goo.gl/HtvYxY. But after enduring a three-year court battle and spending millions in attorney's fees, the City of Palmdale ultimately capitulated, agreeing to change from at-large to by-district elections and to pay Shenkman $4.5 million in attorney's fees. *Id.* Palmdale's total bill for the litigation ultimately rose to approximately $7 million. *See* Steve Scauzillo, *Lawyer to South Pasadena: Change the Way You Do Elections or Get Sued*, Pasadena Star-News (July 18, 2017), https://goo.gl/wMkB1M.

Since the Palmdale case, Shenkman has become increasingly aggressive in sending CVRA demand letters. They all follow the same formula—a letter from Shenkman threatening to sue if the city did not transition to by-district elections and a warning that the city's failure to do so would lead to the same massive liability Palmdale suffered. One by one, the targeted cities have suffered staggering liability or preemptively surrendered. These include—just to name a few—Modesto ($3 million in fees); Anaheim ($1.2 million in fees); Whittier (over $1 million in fees); Santa Barbara ($600,000 in fees); Madera Unified (about $170,000 in fees); Costa Mesa ($55,000 in fees); Merced ($42,000 in fees); and Placentia ($20,000 in fees). *See The California Voting Rights Act and Districting: The Demographer's Perspective*, National Demographics Corporation at 5 (May 9, 2016), https://goo.gl/yY3Sgz.

Indeed, numerous cities in California right now are facing similar dilemmas— engage in race-based gerrymandering or face massive liability under the CVRA. *See, e.g.,* Lauryn Schroeder, *Group Threatens San Diego City Council with Lawsuit over School Elections*, San Diego Union-Tribune, July 30, 2018 (San Diego), https://bit.ly/2LSfJBh; Carina Woudenberg, *City Council Considers District Maps*, Half Moon Bay Review, July 25, 2018 (Half Moon Bay), https://bit.ly/2LLK05k; Kelci Parks, *Mayor Calls District*

8

*Elections Ordeal a Money Grab*, Fort Bragg Advocate-News, July 26, 2018 (Fort Bragg), https://bit.ly/2AsClnk.

### D.   The City of Poway Abandons At-Large Districts To Avoid CVRA Liability.

Like many California municipalities, the City of Poway for decades used an at-large voting system to elect its City Council. On June 7, 2017, the City received a certified letter from Kevin Shenkman asserting that the City's at-large system violates the CVRA. Doc. 1 ("Compl.") ¶ 32. Shenkman asserted that "voting within Poway is racially polarized, resulting in minority vote dilution, and therefore Poway's at-large elections violate the [CVRA]." *Id.* ¶ 33. He added that the CVRA is "different" from the VRA "in several key respects, as the [California] Legislature sought to remedy what it considered restrictive interpretations given to the federal act." *Id.* "The California Legislature dispensed with the requirement in *Gingles* that a minority group demonstrate that it is sufficiently large and geographically compact to constitute a 'majority-minority district.' Rather, the CVRA requires only that a plaintiff show the existence of racially polarized voting to establish that an at-large method of election violates the CVRA, not the desirability of any particular remedy." *Id.*

According to Shenkman, "Poway's at-large system dilutes the ability of Latinos (a 'protected class') to elect candidates of their choice or otherwise influence the outcome of Poway's council elections." *Id.* ¶ 34. Unless the City "voluntarily change[s] its at-large system of electing council members ... [he] will be forced to seek judicial relief." *Id.* He reminded the City that he had sued "the City of Palmdale for violating the CVRA," and that "[a]fter spending millions of dollars, a district-based remedy was ultimately imposed upon the Palmdale city council, with districts that combine all incumbents into one of the four districts." *Id.* Shenkman gave the City until July 21, 2017 to notify him whether it would come into compliance with the CVRA. *Id.*

On June 20, 2017, in response to the Shenkman letter, the City Council held a closed session to discuss the threatened CVRA litigation. *Id.* ¶ 35. As reported out by the

9

17cv2032

City Attorney after the closed session, the City Council provided direction to staff to prepare a resolution of intention for establishing and implementing by-district elections for the City Council members to be presented for consideration at the July 18, 2017 City Council meeting. *Id.* In recommending the adoption of the resolution ahead of the July 18 meeting, the City Attorney explained that "the risks and costs associated with protracted CVRA litigation—particularly in light of results in all other cities that have fought to retain at-large voting—cannot be ignored. The public interest may ultimately be better served by a by-district electoral system if converting to that system avoids significant attorneys' fees and cost award." *Id.* ¶ 36.

At the City Council meeting on July 18, an outside attorney the City hired to advise it on the Shenkman letter outlined the difficulty in defending CVRA lawsuits. *Id.* ¶ 37. He provided examples of prior attorney's fees awards under the CVRA and explained that "[t]he state statutory scheme when it was adopted by the state legislature effectively removed burdens of proof that exist under the federal Voting Rights Act. And what that effectively means is that it is virtually impossible for governmental agencies to defend against lawsuits brought under the CVRA. And that's in fact why you see cities throughout the State converting … in the face of these demand letters." *Id.*

Three citizens spoke during the public discussion portion of the meeting. *Id.* ¶ 38. The first speaker, a long-time advocate for by-district elections, said "I thought we'd have to go through the initiative process to make it happen. It's amazing what … one letter from a lawyer can do." *Id.* The second speaker supported change to the electoral process in the City more generally but was not an advocate for by-district elections necessarily. *Id.* ¶ 39. He stated: "I think what you are doing as far as changing to districts is not [the] optimum but [] certainly will get rid of the problem of getting the lawsuit." *Id.* The third speaker opposed a change to by-district elections but acknowledged to the City Council that, due to the threatened lawsuit, "I understand you don't really have a choice here." *Id.* ¶ 40.

Each member of the City Council then expressed his strong disapproval of the changes that the CVRA was forcing the City to make. *Id.* ¶ 41. City councilmember Jim Cunningham explained that "the [safe-harbor provision] is truly the shield … we are using to avoid attorney's fees, and costs, and protracted litigation." *Id.* ¶ 42. He then specifically sought advice from the outside attorney on whether they were utilizing that provision correctly to avoid those burdens. City councilmember Dave Grosch explained that he supported by-district elections eight years ago. *Id.* ¶ 43. But his experience as an at-large councilmember where he serves and supports the entire community—and not just one district—convinced him that at-large elections were better. *Id.* In reference to Shenkman's letter, he added, "I really hate that the City is … being told to do this by someone who doesn't live in Poway" and made clear that the letter was the only reason the City was changing to by-district elections. *Id.*

City councilmember John Mullin asked the outside attorney, "If at some point in time, … somebody does succeed in challenging any or all of the portions of the act, would we … then have the option to revisit the decision to use district elections?" *Id.* ¶ 44. The attorney explained the City would be able to do so. *Id.* Councilmember Mullin concluded: "We've gone through denial, and we've gone through anger, and now we're into acceptance. So, to those of you in the audience who think that we should be fighting this, we concur, we were there awhile back as well. I have no illusions that this will lead to better government for our city. I'm pretty proud of the job we do as we are now constituted… . But having said all of that, again we have a gun to our heads and we have no choice." *Id.*

Deputy Mayor Barry Leonard said, "I get it. I hate it but I get it." *Id.* ¶ 45. He explained his view that "we respond to everybody in the City. We don't pick certain people in certain neighborhoods and say we'll treat them any differently. There is no evidence of that whatsoever. So, I feel like we're already being found guilty of something and we don't have a chance to prove our innocence. It's just the deck is stacked. So, rather than spend a million dollars of the taxpayers' money, we roll over to these bullies."

*Id.* Mayor Steve Vaus concluded, "I'll just echo that this council does a remarkable job [with at-large elections]. … But we've got to do what we've got to do. And job one is to protect the treasure of our constituents. And it's their money we'd be putting at risk [with litigation] and none of us are willing to do that." *Id.* ¶ 46.

The City Council adopted Resolution No. 17-046 setting forth its intention to transition from at-large to by-district elections, pursuant to Elections Code section 10010(e)(3)(A). *Id.* ¶ 47. The Resolution stated that after "the City [had] received a letter threatening action under the California Voting Rights Act," it had "determined that it is in the best interest of the City to move from its current at-large electoral system to a by-district election for members of the City Council, in furtherance of the purposes of California Voting Rights Act." *Id.*

On August 1, 2017, August 8, 2017, and August 18, 2017, the Council held meetings where it received public input on drawing new districts, consulted a demographer on how to draw new districts, and evaluated potential maps for the new districts. *Id.* ¶ 48. On August 31, 2017, the Council voted 5-0 to proceed with Map 133, an election plan that divides the City into four districts. *Id.* ¶ 49. On September 19, 2017, the Council introduced an ordinance for first reading and public comment that enacted Plan 133. *Id.* ¶ 50. For his part, councilmember Mullin reiterated his view that the City "went down this path with the full recognition that this was our only reasonable option. Never did I, nor do I now, believe that this will lead to better governance for our city. … I support the [proposed ordinance] because of a lack of choice and not because I think it's best for the City. … I'm still begrudgingly doing this." *Id.*

On October 3, 2017, the Council adopted the ordinance enacting Map 133. *Id.* ¶ 51. In voting for the ordinance, councilmember Mullin stated, "I don't want my affirmative vote on this item to be construed in any way as my support for this notion for district elections. … I will support the motion because we have no choice not because I think district elections are what's best for the city." *Id.*

### E.    Procedural History

Plaintiff Don Higginson is a resident of Poway and a registered voter. Under the longstanding at-large system, Higginson could vote for all four City Council seats, but under the new by-district plan he will be able to vote only in District 2.

Higginson brought this suit on October 4, 2017, just one day after the ordinance was enacted, *see* Doc. 1, and moved for a preliminary injunction on October 19, 2017, more than a year before the 2018 election, *see* Doc. 11. The Attorney General opposed that motion and filed a separate motion to dismiss. *See* Doc. 33. For its part, the City of Poway took a "neutral position," stating that it would not "defend the constitutionality of the CVRA or otherwise actively support or oppose" Higginson's motion for preliminary injunction. Doc. 16.

This Court denied Higginson's motion for preliminary injunction and granted Defendants' motion to dismiss, holding in an order issued on February 23, 2018 that Higginson could not show his injuries were caused by the CVRA and thus lacked Article III standing. *See* Doc. 68. Higginson appealed. After a highly expedited briefing and argument process, the Ninth Circuit reversed. The court held that Higginson had adequately demonstrated Article III standing, and remanded for further proceedings. On remand, this Court instructed the parties to file any renewed motions by August 2, 2018. Higginson renewed his motion for preliminary injunction and the Attorney General again moved to dismiss. *See* Docs. 101, 103.

### STANDARD OF REVIEW

The Attorney General has moved to dismiss this case for failure to state a claim under Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under Rule 12(b)(6), "all factual allegations in [the Plaintiff]'s complaint are taken as true and all reasonable inferences are drawn in his favor." *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

**ARGUMENT**

**I.    Higginson Has Stated a Claim for Relief Under the Fourteenth Amendment.**

> **A.    Higginson Alleges a Cognizable Claim under the Fourteenth Amendment.**

Higginson's equal-protection claim is straightforward. Section 1983 of the Civil Rights Act "creates a cause of action against any person who, acting under color of state law, violates the constitutional rights of another person." *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001) (citing 42 U.S.C. § 1983). The Fourteenth Amendment to the U.S. Constitution, in turn, provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under Supreme Court precedent, "if racial considerations predominated over others" when an electoral system was created, that action will violate the Fourteenth Amendment unless it "withstand[s] strict scrutiny." *Cooper*, 137 S. Ct. at 1464. Once strict scrutiny is triggered, "[t]he burden … shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.*

Here, Higginson alleges that his Fourteenth Amendment rights were violated when the CVRA's race-based provisions forced Poway to abandon its longstanding at-large system and adopt a by-district system. To begin, there is no question that race predominated over other factors in the enactment of Map 133. Indeed, race was the *only* factor in the City's decision to abandon its at-large voting system in favor of by-district elections. The City was required, as a matter of state law, to comply with the CVRA. The CVRA, in turn, commands California localities (including the City) to switch to by-district elections upon a showing of racially-polarized voting—period. In other words, the locality must redistrict *solely* because individuals of one race tend to vote for one political party and individuals of another race tend to vote for the other political party. *See* Cal. Elec. Code §§ 14026(e), 14028(a); *Gingles*, 478 U.S. at 74. It is difficult to imagine a statute more dominated by racial considerations than the CVRA.

14

For Map 133 to withstand equal-protection review, then, the CVRA must pass strict scrutiny. But it cannot do so. California does not have a compelling interest in forcing localities to redistrict based solely on the existence of racially-polarized voting. There may be a compelling interest in ensuring that "the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. But a statute that (unlike Section 2) focuses solely on racially-polarized voting does not pursue that anti-vote-dilution interest. The CVRA instead entitles "minority groups to the maximum possible voting strength." *Bartlett*, 556 U.S. at 16 (plurality opinion). Maximizing the voting power of minority groups is not a compelling interest. *See Miller*, 515 U.S. at 926; *Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997) (explaining that *Miller* held that the Department of Justice's "max-black policy" violated the Equal Protection clause because of its "entirely race-focused approach to redistricting").

Moreover, the CVRA is not narrowly tailored to remedying racial discrimination in voting. The CVRA eliminates Section 2's requirement that the minority group be sufficiently "compact" such that it would have "the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. "Without such a showing, 'there neither has been a wrong nor can be a remedy.'" *Bartlett*, 556 U.S. at 15 (plurality opinion) (quoting *Growe*, 507 U.S. at 41). Eliminating the compactness requirement, in other words, is not narrowly tailored to eliminating discrimination in voting because it would "unnecessarily infuse race into virtually every redistricting." *Id.*, at 21 (citation omitted). In sum, the Supreme Court has explained that Section 2 *might* be a narrowly-tailored remedy for racial discrimination in voting. A statute, like the CVRA, that disregards the Supreme Court's clear teachings about how to ensure that race does not become too dominant a factor in redistricting could never be narrow tailored.

### B.   Higginson Is Challenging the Constitutionality of His District, Which Was Drawn Solely To Comply With the CVRA's Race-Based Mandates.

The Attorney General first contends (at 5-8) that Higginson cannot state a claim for racial gerrymandering because he "does not challenge the boundaries of any specific

15

district the City of Poway drew in creating Map 133" and has not shown that "traditional districting principles were subordinated to race." In other words, the Attorney General suggests that the CVRA itself is effectively immune from review and that only a city's *response* to the CVRA's mandates may be challenged. That argument is wrong on every level.

The CVRA is state action and, hence, must comply with the Equal Protection Clause. *See Sylvia Development Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995) ("The Equal Protection Clause limits all state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." (emphasis omitted)). The parties disagree as to whether the CVRA is unconstitutional. But the idea that its role in redistricting can be ignored is entirely baseless. Under the Attorney General's view, California could pass a law expressly requiring all municipalities to switch to by-district elections to entitle "minority groups to the maximum possible voting strength," yet that law would not trigger strict-scrutiny review unless the shape of the resulting districts violated traditional redistricting criteria.

The Attorney General's view has never been the law, and his motion ignores controlling authority to the contrary. The Supreme Court has squarely rejected the argument that "racial considerations cannot predominate in drawing district lines unless there is an 'actual conflict' between those lines and 'traditional districting principles.'" *Cooper*, 137 S. Ct. at 1469 n.3. (citation omitted). When "race furnishe[s] 'the overriding reason for choosing one map over others,' a further showing of 'inconsistency between the enacted plan and traditional redistricting criteria' *is unnecessary to a finding of racial predominance.*" *Id*. (citing *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017)) (emphasis added). In *Cooper* and *Bethune-Hill*, race was the predominant factor in choosing one statewide map over another *irrespective* of compliance with traditional redistricting criteria. Here, too, race was the predominant factor in the City's decision to switch from at-large to by-district elections (because of the CVRA's statutory

16

command) irrespective of compliance with traditional redistricting criteria. Strict scrutiny applies to both kinds of cases. For that reason, a city can comply with "California's statutory criteria that enshrine traditional, non-racial districting principles," *see* Mot. 7, yet still violate the Equal Protection Clause.

For the same reasons, the Attorney General's reliance (at 6-7) on *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), is misplaced. The Attorney General repeatedly quotes language stating that a racial gerrymandering claim requires a showing "that race was improperly used in the drawing of the *boundaries* of one or more specific electoral districts." *Id.* at 1265 (emphasis added); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (same). But the Attorney General ignores critical language *two paragraphs later*, in which the Court emphasized that "[v]oters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district." *Alabama Legislative Black Caucus*, 135 S. Ct. at 1265. And "voters might make the claim that *every* individual district in a State suffers from racial gerrymandering." *Id.* That theory was "not the claim that the District Court … considered" in *Alabama Legislative Black Caucus*. *Id.* But it is exactly the type of claim Higginson is pursuing here—he is using broader evidence about the CVRA's unconstitutionality to show that the *district in which he lives*, like every other district in Poway, is the product of a process in which race predominated over all other considerations in violation of the Equal Protection Clause.

Finally, the Attorney General contends (at 6) that Higginson's equal protection claim is not viable because the racial gerrymandering doctrine arose in a different "context" and has "never been applied to a state statute seeking to address vote dilution resulting from at-large elections." But lower courts are not free to disregard the Supreme Court's interpretation of the Constitution on the ground that the relevant precedents arose in a different factual context. "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996)." In other words, "the

17

*reasoning* of a Supreme Court case also binds lower courts," and "once a rule, test, standard, or interpretation has been adopted by the Supreme Court, that same rule, test, standard, or interpretation must be used by lower courts in later cases." *United States v. Duvall*, 740 F.3d 604, 609 (Mem.) (D.C. Cir. 2013) (Kavanaugh, J., concurring in denial of reh'g en banc). The constitutional *principles* underlying the racial gerrymandering doctrine apply with full force in this case.

### C.   The CVRA Is Not a Race-Neutral Statute.

The Attorney General further contends (at 8-9) that the CVRA is not subject to strict scrutiny because it "does not sort voters by race" and is a "race neutral statute" that "says nothing at all about *how* lines are to be drawn in creating single-member districts." Accordingly, the Attorney General argues, the statute "does not warrant strict scrutiny but is subject instead to rational basis review." Mot. 9.

The CVRA is plainly subject to strict scrutiny. The Supreme Court has held that "if racial considerations predominated over others" in fashioning an electoral system, that system must "withstand strict scrutiny." *Cooper*, 137 S. Ct. at 1464. As the Attorney General has recognized, Higginson claims that "the City's decision to move from an at-large election system to a by-district election system was 'driven by race' and that was the predominant factor in the resulting district lines because they were tainted by that decision." Doc. 22, at 7. That claim depends, in turn, on whether race predominates under the CVRA given that it drove the City to make the switch. The ultimate issue, in other words, is whether the CVRA makes race the predominant redistricting factor in California. If it does, then strict scrutiny applies.

There is no question that the CVRA makes race the predominant factor. The Supreme Court has not yet decided whether even Section 2 of the VRA goes too far in its use of race. *See Cooper*, 137 S. Ct. at 1464. As Justice Kennedy warned, interpreting Section 2 to "infuse race into virtually every redistricting" would raise "serious constitutional questions." *LULAC v. Perry*, 548 U.S. 399, 446 (2006) (opinion of Kennedy, J.) (citation omitted); *see Johnson v. De Grandy*, 512 U.S. 997, 1028-29 (1993)

18

(Kennedy, J., concurring in part and concurring in the judgment). That is why the Supreme Court has gone to great lengths to construe Section 2 more narrowly. *See supra* 1-4.

Yet the CVRA ignores this admonition. Liability under the CVRA turns *solely* on the existence of racially polarized voting, to the exclusion of all other factors. *See* Cal. Elec. Code § 14028(a). That is just the kind of rule the Supreme Court has cautioned would make race far too significant a factor. *See Growe*, 507 U.S. at 40-41; *Bartlett*, 556 U.S. at 15 (plurality opinion). Forcing municipalities to switch to by-district elections solely because votes are being cast along racial lines—even where at-large elections are not denying minorities the ability to form a compact, single-member district—is a paradigmatic race-based policy that triggers strict scrutiny. The CVRA's hyper-focus on racially polarized voting "reinforces the perception that members of the same racial group … think alike, share the same political interests, and will prefer the same candidates at the polls." *Shaw I*, 509 U.S. at 647.

The Attorney General also disregards the fact that racially polarized voting—on its own—cannot cause vote dilution. There is vote dilution when, *inter alia*, "'the minority group [is] able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.'" *Gomez v. City of Watsonville*, 863 F.2d 1407, 1413 (9th Cir. 1988) (quoting *Gingles*, 478 U.S. at 50). That is because "unless the minority group could constitute a majority in a single-member district, there is no sense in which 'the *multimember form* of the district' is responsible for any inability of the minority group to participate equally." *Id*. (quoting *Gingles*, 478 U.S. at 50). The CVRA thus cannot be justified on the ground that it remedies vote dilution; it instead impermissibly seeks to *maximize* minority electoral power. *See Miller*, 515 U.S. at 926 (maximizing minority voting power not a compelling interest); *Abrams*, 521 U.S. at 85-86 (same).

Moreover, as the Attorney General acknowledges (at 10), the CVRA goes even farther than Section 2 by focusing on the ability of a protected class "to *influence* the

19

outcome of an election." Cal. Elec. Code § 14027 (emphasis added). It is one thing to ensure (as Section 2 of the VRA does) that at-large elections are not used to deny minority voters the ability "to elect a candidate of their choice." *Bartlett*, 556 U.S. at 11 (plurality opinion). But outlawing at-large elections merely to ensure that minority voters can *influence* elections exacerbates the problem. Indeed, it was the suggestion that Section 2 might require the creation of "influence districts" that led Justice Kennedy (joined by the Chief Justice and Justice Alito) to raise concerns about that law's constitutionality. *See Perry*, 548 U.S. at 446. The Court thus concluded that "§ 2 does not require the creation of influence districts." *Bartlett*, 556 U.S. at 13 (plurality opinion).

The notion that the CVRA may make race a more predominant redistricting factor than Section 2 yet somehow avoid strict-scrutiny review is untenable. The Supreme Court has correctly assumed that the federal VRA makes race the predominant factor in redistricting. *Cooper*, 137 S. Ct. at 1464; *Alabama Legislative Black Caucus,* 135 S. Ct. at 1274. If strict scrutiny applies to the federal VRA, then it applies *a fortiori* to the CVRA as well. The Attorney General badly mischaracterizes Higginson's position by suggesting (at 9-11) that Higginson is arguing the CVRA is "limited" by Section 2 of the VRA. Higginson has never made any such argument. He instead contends that the same *constitutional principles* that informed the Supreme Court's interpretation of Section 2 show that the CVRA goes much too far in its use of race and is thus unconstitutional.

Finally, the Attorney General (at 9-11) retreats to reliance on *Sanchez v. City of Modesto*, 51 Cal. Rptr. 3d 821 (Cal. Ct. App. 2006). With respect, that ruling is flawed and should not be followed. *Sanchez* held that the CVRA is race neutral because it does "not confer benefits or impose burdens on any particular racial group and does not burden anyone's right to vote." 51 Cal Rptr. 3d at 840. That reasoning conflicts with binding precedent. The CVRA requires cities to abandon at-large elections if voters have different electoral preferences based on their "race, color, or language minority group." Cal. Elec. Code § 14026. That is a racial classification, and all racial classifications get strict scrutiny regardless of their purported universal applicability. *See Powers v. Ohio*, 499

20

U.S. 400, 410 (1991) ("It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree."); *Shaw I*, 509 U.S. at 651 ("[R]acial classifications receive close scrutiny even when they may be said to burden or benefit the races equally."); *Johnson v. California*, 543 U.S. 499, 506 (2005) (applying strict scrutiny to a policy of racially segregating prisoners despite the fact that "all prisoners are 'equally' segregated"). In fact, the same reasoning the *Sanchez* court used to find the CVRA race-neutral would apply with full force to Section 2 of the federal VRA. Yet the Supreme Court has never suggested Section 2 could get anything less than strict scrutiny review. The Supreme Court would not be struggling with Section 2's constitutionality if *Sanchez* were correct.

### D. Higginson Has Stated a Claim for a Facial Challenge to the CVRA.

Contrary to the Attorney General's argument otherwise (at 11-13), Higginson has stated a claim that the CVRA is facially unconstitutional. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2449 (2015). When assessing whether a statute is facially invalid, the Court must "consider[] only applications of the statute in which it actually authorizes or prohibits conduct." *Id.* at 2451. Here, the CVRA "actually prohibits conduct" only where it does not duplicate the relief available under Section 2 of the FVRA—*viz.*, when it forces municipalities to abandon an at-large electoral system based strictly on the existence of racially polarized voting and/or to allow the protected class of voters to influence electoral outcomes. As explained above, the CVRA violates the Equal Protection Clause in all those applications because, by definition, it is in those applications where race becomes the predominant redistricting factor without a sufficient justification for doing so. *See supra* 14-15. The constitutional flaw is with the CVRA itself—not with the manner in which it is being applied.

The Attorney General argues that "[t]hough it is possible that a political subdivision might adopt a single-member redistricting plan that does not comport with constitutional requirements, the possibility of some court imposing an unconstitutional

remedy under the CVRA in some cases is not a basis for *facial* invalidation." Mot. 13 (citation and alteration omitted). But the Attorney General again confuses the required inquiry. Higginson is arguing that race infected all aspects of Map 133 because the CVRA's race-based mandates were the sole reason *why* the City decided to draw new districts in the first place. No speculation is needed to resolve the issue underlying this facial claim: whether the CVRA violates the Fourteenth Amendment when it forces a city to abandon its at-large electoral system based solely on racially polarized voting.

## CONCLUSION

For these reasons, Higginson respectfully requests that the Court deny the Attorney General's motion to dismiss.

Respectfully submitted,

/s/ *William S. Consovoy*
Bryan K. Weir, CA Bar # 310964
William S. Consovoy, VA Bar # 47704 (*pro hac vice*)
Thomas R. McCarthy, VA Bar # 47154 (*pro hac vice*)
J. Michael Connolly, VA Bar # 77632 (*pro hac vice*)
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
bryan@consovoymccarthy.com
(703) 243-9423

22

1

**CERTIFICATE OF SERVICE**

2

   I hereby certify that I electronically filed this pleading with the Clerk of the Court
using the CM/ECF system. I certify that all participants in this case are registered
CM/ECF users and that serve will be accomplished by the CM/ECF system.

3

4

5

   Dated:      August 27, 2018        */s/ William S. Consovoy*
                                       Bryan K. Weir
6                                      CONSOVOY MCCARTHY PARK PLLC
                                       3033 Wilson Boulevard
7                                      Suite 700
                                       Arlington, VA 22201
8                                      bryan@consovoymccarthy.com
                                       (703) 243-9423
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28