UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON HIGGINSON,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as ATTORNEY GENERAL OF CALIFORNIA; and CITY OF POWAY,<br><br>　　　　　　　　　　Defendants. | Case No.: 17cv2032-WQH-JLB<br><br>**ORDER** |

HAYES, Judge:

　　The matter before the Court is the motion for a preliminary injunction filed by Plaintiff Don Higginson. (ECF No. 101).

**I.　　PROCEDURAL BACKGROUND**

　　On October 4, 2017, Higginson initiated this action by filing a complaint against Defendants Xavier Becerra, Attorney General of California (the Attorney General), and the City of Poway. (ECF No. 1). Higginson alleges a cause of action pursuant to 42 U.S.C. §§ 1983 and 1988 for violation of his Fourteenth Amendment rights. Higginson asserts that the City of Poway adopted by-distict elections in order to comply with the California Voting Rights Act (CVRA), and that such districting segregates voters on the basis of race without sufficient justification. *Id.* at 1–3.

On February 23, 2018, the Court dismissed the Attorney General and the City of Poway for lack of subject matter jurisdiction on standing grounds, denied a motion for a preliminary injunction filed by Higginson, and denied a motion to intervene (ECF No. 18) filed by Defendant-Intervenors California League of United Latin American Citizens, Jacqueline Contreras, Xavier Flores, Judy Ki, and Hiram Soto (LULAC) as moot. Higginson appealed. LULAC cross appealed.

The Court of Appeals reversed the dismissal of the City of Poway and the Attorney General, granted LULAC's motion to intervene on the merits, and remanded for further proceedings. (ECF No. 115 at 5–6). The Court of Appeals found that Higginson "adequately alleged that he resides in a racially gerrymandered district and that the City's adoption of Map 133 reduced the number of candidates for whom he can vote." *Id.* at 5. The Court of Appeals found that Higginson has standing to challenge "the City's actions, including his argument that the City violated his rights because the CVRA, with which the City sought to comply, is unconstitutional under the Equal Protection clause." *Id.*

On August 2, 2018, Higginson moved for a preliminary injunction "temporarily enjoining Defendant Attorney General Xavier Becerra and his agents from enforcing the California Voting Rights Act and Defendant City of Poway from using Map 133 for elections during the pendency of this action." (ECF No. 101 at 2). On August 27, 2018, the City of Poway, the Attorney General, and LULAC filed responses opposing the preliminary injunction. (ECF Nos. 112–14). On August 31, Higginson filed a reply. (ECF No. 117).

## II. BACKGROUND FACTS

The CVRA prohibits use of "[a]n at-large method of election" to "impair[] the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election, as a result of the dilution or the abridgment of the rights of voters who are

members of a protected class."[1] Cal. Elec. Code § 14027. A CVRA violation can be "established if it is shown that racially polarized voting occurs in elections."[2] Whether "members of a protected class are not geographically compact or concentrated may not preclude a finding of racially polarized voting, or a violation of Section 14027 and this section, but may be a factor in determining an appropriate remedy." *Id.* § 14028. The CVRA includes a private right of action for voters in protected classes. *Id.* § 14032.

In 2016, California amended the Elections Code to require a prospective CVRA plaintiff to notify a political subdivision before filing suit—commonly known as the safe harbor provision. Cal. Elec. Code § 10010. The amendment gives the political subdivision forty-five days to "pass a resolution outlining its intention to transition from at-large to district-based elections, specific steps it will undertake to facilitate this transition, and an estimated time frame for doing so," which prohibits the prospective plaintiff from suing "within 90 days of the resolution's passage." *Id.* The prospective plaintiff "is entitled . . . to reimbursement capped at $30,000." *Id.* § 10010(f)(3).

The City of Poway has used an at-large voting system to elect its City Council for decades. (ECF No. 101-1 at 16). "On June 7, 2017, the City received a certified letter from an attorney, Kevin Shenkman, asserting that the City's at-large system violates the CVRA." *Id.* The letter stated that "Poway's at-large system dilutes the ability of Latinos (a 'protected class') to elect candidates of their choice or otherwise influence the outcome of Poway's council elections." (ECF No. 101-4 at 8). The letter "urge[d] Poway to voluntarily change its at-large system of electing council members," and to respond by July

---

[1] "'Protected class' means a class of voters who are members of a race, color, or language minority group, as this class is referenced and defined in the federal Voting Rights Act of 1965." Cal. Elec. Code § 14026.
[2] "Racially polarized voting" is defined as "voting in which there is a difference, as defined in case law regarding enforcement of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10301 et seq.), in the choice of candidates or other electoral choices that are preferred by voters in a protected class, and in the choice of candidates and electoral choices that are preferred by voters in the rest of the electorate." Cal. Elec. Code § 14026(e).

3

21, 2017, "[o]therwise, on behalf of residents within the jurisdiction, we will be forced to seek judicial relief." *Id.* at 9.

During "a closed session on June 20, 2017," the City Council discussed "the threatened CVRA litigation," and directed the "staff to prepare a resolution of intention for establishing and implementing by-district elections for . . . consideration at the July 18, 2017 City Council meeting." *Id.* at 2. The City Attorney recommended "adoption of the resolution ahead of the July 18 meeting" to take advantage of the safe harbor provision–"not based on any admission or concession that the City would ultimately be found to have violated the CVRA," but because "the risks and costs associated with protracted CVRA litigation—particularly in light of results in all other cities that have fought to retain at large voting—cannot be ignored." *Id.* at 3. The City Attorney explained that the "public interest may ultimately be better served by a by-district electoral system if converting to that system avoids significant attorneys' fees and cost award." *Id.*

At the July 18 meeting, an outside attorney advised the City Council that "it is virtually impossible for governmental agencies to defend against lawsuits brought under the CVRA" because the statute "effectively removed burdens of proof that exist under the federal Voting Rights Act." (ECF No. 101-3 at 3). The meeting agenda included data showing that "every government defendant in the history of the CVRA that has challenged the conversion to district elections has either lost in court or settled/agreed to implement district elections." (ECF No. 101-4 at 1). The agenda estimated that "voluntarily converting to district elections" would cost the city "approximately $82,500," whereas a lawsuit would probably cost the city over $1,000,000—and possibly "upwards of $4,500,000." *Id.* at 4.

Councilmember Cunningham asked the attorney if the City of Poway's plan complied with the safe harbor provision, stating that the provision "is truly the shield . . . we are using to avoid attorney's fees, and costs, and protracted litigation." *Id.* at 4. Councilmember Mullin stated,

> We've gone through denial, and we've gone through anger, and now we're

> into acceptance. So, to those of you in the audience who think we should be fighting this, we concur, we were there awhile back as well. I have no illusions that this will lead to better government for our city. . . . [W]e have a gun to our heads and we have no choice.

*Id.* Deputy Mayor Leonard stated "I get it. I hate it but I get it. . . . We don't pick certain people in certain neighborhoods and say we'll treat them any differently. There is no evidence of that whatsoever." *Id.* Mayor Vaus concluded, "we've got to do what we've got to do. And job one is to protect the treasure of our constituents. And it's their money we'd be putting at risk [with litigation] and none of us are willing to do that." *Id.* at 5.

The councilmembers then adopted Resolution No. 17-046, setting forth the intention to transition from at-large to by-district elections. (ECF No. 101-6 at 1). The resolution stated that "the City received a letter threatening action under the California Voting Rights Act." *Id.* The resolution stated that "the City Council has determined that it is in the best interest of the City to move from its current at-large electoral system to a by-district election for members of the City Council, in furtherance of the purposes of" the "California Voting Rights Act." *Id.* In August, the councilmembers unanimously approved Map 133, a four-district plan. (ECF No. 101-8 at 3). On October 3, 2017, Ordinance 809 enacted Map 133, to be used "beginning at the General Municipal Election in November 2018." (ECF No. 101-10 at 1, 3, 5–6).

The Poway City Council election is scheduled for November 6, 2018. (ECF No. 112-2 at 3). The candidate nomination period was July 16 to August 10, 2018, during which election officials "spent approximately 250 hours working with potential candidates, publication of notices, website election page updates, preparation of candidate materials, and processing nomination papers." *Id.* On August 16, 2018, the clerk's office filed candidate materials with the registrar, who began "the typesetting, layout, proofing, and printing of the ballots" on August 31, 2018. *Id.* "[T]he identity of the candidates" was "published in . . . the local newspaper," and "translated into Vietnamese, Spanish, Traditional Chinese, and Tagalog, as required by federal law," to "be published in the

appropriate foreign language newspapers the first week of September." *Id.* "[S]ample ballot and voter information pamphlets" are "mailed to the voters between September 27, 2018 and October 27, 2018," and "actual, final" ballots were "sent to military and overseas voters . . . September 22, 2018." *Id.*; ECF No. 112 at 9.

If election officials were enjoined from holding by-district elections for the November 2018 election, the City of Poway would be responsible for "printing and distributing its own ballots" because the registrar's deadlines have passed. *Id.* at 4–5. The cost "associated with doing so would exceed $650,000 . . . and potentially seven figures, if such a process is even possible." *Id.* at 5. Election officials would "likely spend[] at least 200 hours" processing new materials and "would be forced to spend a significant amount of time and resources on an extensive public outreach campaign to inform both existing and potential new candidates, as well as the public at large, about the momentous last minute change to the City's Election." *Id.* The additional time and resources required to comply with such an injunction "would greatly disrupt the normal operations of the City." *Id.*

### III. CONTENTIONS OF THE PARTIES

Higginson seeks a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) to temporarily enjoin "Defendant Attorney General Xavier Becerra and his agents from enforcing the California Voting Rights Act and Defendant City of Poway from using Map 133 for elections during the pendency of this action." (ECF No. 101 at 2). Higginson contends that he will succeed on the merits of his Fourteenth Amendment claim because the CVRA, with which the City of Poway sought to comply, caused race to be the "*only* factor in the City's decisions to abandon its at-large voting in favor of by-district elections." (ECF 101-1 at 22) (emphasis in original). Higginson contends that districting decisions pursuant to the CVRA are race-based classifications lacking the compelling

6

17cv2032-WQH-JLB

interest and narrow tailoring necessary to comply with the Equal Protection Clause.³ *Id.* at 22–23. Higginson contends such a violation of his constitutional rights is "per se irreparable harm."⁴ *Id.* at 23.

Higginson contends that enjoining the use of Map 133 is in the public interest because his constitutional voting rights have been violated. Higginson further contends that "35,000 other Poway voters . . . will suffer the same irreparable injury." Higginson asserts that "the rights millions of other California voters" are at risk of suffering his fate, because other cities are "future targets" for notice letters like the City of Poway received in this case. (ECF No. 101-1 at 26–27). Higginson contends that equitable considerations favor an injunction because he "filed his lawsuit the day after the ordinance passed," he "filed his motion for a preliminary injunction two weeks later, more than a year before the 2018 election," *id.* at 28, and he "has sought to expedite this case at every potential juncture," (ECF No. 117 at 11). Higginson contends that the injunction he requests would restore the status quo, because this is the first election cycle affected by the CVRA.

The City of Poway "intends to remain neutral with respect to the ultimate merits" of Higginson's constitutional claims. (ECF No. 112 at 5). The City of Poway contends, "without expressing any opinion as to whether or not an injury exists," that an "'injury' of voting for two candidates instead of four, in one election that is being conducted under a method of election that is expressly permitted by state law for all general law cities, is not 'irreparable' in nature." *Id.* at 15. The City of Poway contends any corresponding injury

---

³ Higginson contends that the CVRA cannot survive strict scrutiny because districts predominantly based on racial considerations—drawn to avoid federal Voting Rights Act liability—are not narrowly tailored enough to avoid Equal Protection violation absent proof "that the minority group is 'geographically compact.'" *Shaw v. Hunt*, 517 U.S. 899, 916 (1996).

⁴ Higginson contends that his irreparable harm is abridgement of his fundamental right to vote because of race. (ECF No. 101 at 23–25). This contention merges "two separate strands of equal protection doctrine: suspect classifications and fundmental rights," *Short v. Brown*, 893 F.3d 671, 678 (9th Cir. 2018), as well as Fifteenth Amendment doctrine.

7

would be redressed in this action as "the City's method of election would, in theory, be impacted in November 2020 and beyond." *Id.*

The City of Poway opposes the motion "based on the significant harm that would result to both the City and the public if the Motion were to be granted on the eve of the November 2018 election." *Id.* at 5. The City of Poway states that "[s]imply put, granting the Motion would wreak havoc in the City." *Id.* at 12. The City of Poway asserts that its "election machinery is not only already in gear, it has completed the majority of its tasks, and is far past the point of no return." *Id.* at 10. The City of Poway asserts that deadlines "dictated by the Registrar, state law, and federal law" have come and gone. *Id.* at 8–9. The City of Poway asserts it has spent "approximately 50 hours on outreach efforts, assuring candidates and the public that the Election is proceeding pursuant to the Ordinance unless and until the City is ordered otherwise," as a result of the "confusion caused by this Action." *Id.* at 8.

The City of Poway asserts that an order to change its voting plans for the "November 2018 Election—assuming *arguendo* that . . . the City [could] comply with such an order—would result in hundreds of hours of extra work by City staff, immense confusion among candidates and the public, and additional, unbudgeted expenditures of taxpayer money, ranging from $650,000 to the millions." *Id.* at 12. The City of Poway contends that the preliminary injunction Higginson seeks "would have the practical effect of enjoining the entire Election." *Id.* at 14. The City of Poway further contends that it "is particularly inequitable to foist the foregoing hardships on the City and its citizens in light of the fact that the City has . . . not been accused [of] any wrongdoing." *Id.*

The Attorney General contends that Higginson's claim fails on the merits. The Attorney General contends that Higginson must challenge "district maps or district lines themselves," rather than a decision to switch from at-large to by-district elections, in order to make out a Fourteenth Amendment racial gerrymandering claim. (ECF No. 113 at 11). The Attorney General asserts Higginson must challenge the maps or lines using evidence of "the number of voters from protected classes included in the district, whether the districts

8

17cv2032-WQH-JLB

are bizarrely shaped, [or] the legislative purpose behind the line drawing." *Id.* at 12–13. The Attorney General asserts that by failing to provide such evidence, Higginson fails to demonstrate that the City of Poway considered race when adopting Map 133. The Attorney General further contends the "CVRA does not sort voters by race" or "require political subdivisions to do so when crafting a remedy for a CVRA violation." *Id.* at 13.

The Attorney General contends that Higginson "has not demonstrated a likelihood of success on the merits" and "he has also failed to demonstrate that he will suffer irreparable harm absent an injunction." *Id.* at 18. The Attorney General asserts the balance of hardships weighs against injunctive relief because "[r]eturning to the at-large election system at this late date would only cause confusion for candidates, voters, and election officials." *Id.* at 19. The Attorney General asserts the public interest weighs against Higginson because "the minority voters the CVRA protects" may be harmed by a preliminary injunction requiring the City of Poway to return to at-large voting. *Id.* at 21.

LULAC contends that Higginson "lacks standing to enjoin statewide enforcement of the CVRA," and that Higginson has not satisfied any of the requisite preliminary injunction factors. (ECF No. 114 at 8). LULAC asserts that "the record in this action is devoid of allegations or evidence of the City placing Poway residents, including Plaintiff, in specific districts in Map 133 on the basis of their race." *Id.* at 16. LULAC asserts that Map 133 created districts that are "similar in demographics" and "reasonably shapely," and that there are no "allegations or evidence of racially discriminatory comments or actions by City officials." *Id.* LULAC further asserts the CVRA did not compel the City of Poway to adopt Map 133. LULAC asserts the City of Poway's "adoption of by-district elections . . . reflected an overarching concern with preserving taxpayer dollars and avoiding costs associated with litigation." *Id.* at 17. LULAC contends that CVRA liability requires "a showing of racially polarized voting," and that, upon such a finding, "[t]he CVRA does not prescribe a particular remedy." *Id.* LULAC asserts that "the City adopted by-district elections voluntarily" and that "the factual question of whether voting in Poway was racially polarized has not been adjudicated." *Id.* LULAC contends Higginson's "right to

9

17cv2032-WQH-JLB

vote will not be violated simply because he cannot vote for representatives for districts where he does not reside," because Higginson has no right to vote for a particular number of candidates. *Id.* at 19–20.

LULAC contends the balance of equities and public interest weigh against Higginson because an injunction would "outright disrupt the election process, upsetting the expectations and electoral activities of Poway residents, candidates for Poway's city council, and election administrators." *Id.* at 22. LULAC further asserts that voters would lose "numerous benefits" from voting by district pursuant to Map 133. *Id.* at 21.

## IV. LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation omitted). "[T]he the burden of proof at the preliminary injunction phase tracks the burden of proof at trial." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011). To obtain preliminary injunctive relief, a movant must "meet one of two variants of the same standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under the first standard, the movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Under the second standard, the movant must show "that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits," that the "balance of hardships tips *sharply* in the plaintiff's favor," and that "the other two *Winter* factors are satisfied." *Id.* (quotation omitted). The balance of equities and public interest factors merge "[w]hen the government is a party." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Under the second standard, when the government is a party, the movant must show serious questions going to the merits; a balance of hardships, merged with public interest

considerations, tipping sharply in the movant's favor; and a likelihood of irreparable harm absent preliminary relief.

## V. DISCUSSION

### A. Balance of Equities, Public Interest, and *Feldman* Factors

In *Southwest Voter Registration Education Project v. Shelley*, the Court of Appeals stated "[t]here is no doubt that the right to vote is fundamental, but a federal court cannot lightly interfere with or enjoin a state election." 344 F.3d 914, 918–19 (9th Cir. 2003). The court stated that "[i]nterference with impending elections is extraordinary," and that the "decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisupted constitutional violation." *Id.* (citations omitted). In *Reynolds v. Sims*, the Supreme Court explained

> [O]nce a State's legislative apportionment scheme has been *found* to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. . . . With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State . . . .

377 U.S. 533, 585 (1964) (emphasis added); *see also Abbott*, slip op. at 21 ("If a plan is found to be unlawful long before the next scheduled election, a court may defer any injunctive relief until the case is completed. And if a plan is found to be unlawful very close to the election date, the only reasonable option may be to use the plan one last time.").

The Court of Appeals has identified "considerations specific to election cases" for courts to "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction." *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367–68 (9th Cir. 2016) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). In *Feldman*, the Court of Appeals

11

enjoined enforcement of a recent Arizona election statute that "ma[d]e the collection of legitimate ballots by third parties a felony." *Id.* at 368. The court determined that enjoining enforcement of the statutue would not "affect the state's election processes or machinery" because "legitimate ballots collected by third parties [we]re accepted and counted, and there [we]re no criminal penalties to the voter"—meaning "[n]o one else in the electoral process [wa]s affected," and "no electoral process [wa]s affected." *Id.* The court determined an injunction was particularly appropriate because the statute "newly criminalize[d] activity associated with voting." *Id.* The court found an injunction would not "disrupt long standing state procedures" because it would restore the status quo "prior to the recent legislative action," which was "affecting th[e] election cycle for the first time." *Id.* at 369. The court found it equitable to grant the injunction because the plaintiff had not delayed in bringing the action. *Id.* The court found it lacked "prima facie reason to believe that the challenged statute was not discriminatory" because there had been no other meaningful legal review to "alleviat[e] the concern that the law violated voting rights." *Id.* The court concluded it had given "careful and thorough consideration" to the election-specific issues, and granted injunctive relief. *Id.*

In this case, the November 2018 election is "impending," and the declaration and exhibit provided by the City of Poway show that the "election machinery is already in progress." *See Reynolds*, 377 U.S. at 585. Whether or not the "existing apportionment scheme" is ultimately "found invalid," enjoining the City of Poway from using Map 133 would be expensive, confusing, and disruptive—it would "requir[e] precipitate changes that [w]ould make unreasonable or embarrassing demands" on the election authorities.[5] *See id.*

---

[5] LULAC contends that Higginson's requested injunction is mooted because the County Registrar, a nonparty, has assumed responsibility for conducting the City of Poway's elections as of July 4, 2018. (ECF No. 114 at 13). LULAC contends that the County Registrar is not an agent of the City of Poway, and would not be "subject to an injunction against the City." *Id.* at 14. LULAC contends that the County Registrar could not "as a practical matter . . . restart the entire pre-election process and . . . comply with a City directive to use its former at-large system." *Id.* Higginson contends that "the county is merely acting

Unlike in *Feldman*, the requested injunction would require a different voting plan and new election materials, which would "affect the . . . processes [and] machinery" of the election. *See* 843 F.3d at 368; ECF No. 112. Unlike in *Feldman*, enjoining the use of Map 133 would confuse, and affect the conduct of, voters and election officials. *Id.* Map 133 is "affecting this election cycle for the first time," and Higginson "did not delay in bringing this action." *See id.* at 369. However, the recent change is not due to conduct by the state legislature this year—the CVRA passed in 2002 and the safe harbor provision passed in 2016. *See* California Voting Rights Act of 2001, ch. 129, 2002 Cal. Legis. Serv. (West) (codified at Cal. Elec. Code §§ 14025–32); Act of Sept. 28, 2016, ch. 737, 2016 Cal. Legis. Serv. (West) (codified at Cal. Elec. Code. § 10010). Map 133 is the status quo in this case, and reversion to the previous method would be the far greater disruption. (ECF No. 112-1).

The CVRA has survived an equal protection challenge in California state court. *See Sanchez v. City of Modesto*, 51 Cal. Rptr. 3d 821, 837–41 (Cal. Ct. App. 2006) (finding the CVRA constitutional). If the CVRA is found to be constitutional, and the Court enjoins Map 133 at this stage, "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott*, slip op. at 21 & n.17.

After careful and thorough assessment of the election-specific *Feldman* considerations, the Court finds that the balance of equities does not tip in Higginson's favor, and that the public interest counsels against granting a preliminary injunction. An injunction at this stage in the proceedings would disrupt the status quo and harm the public interest.

B. **Merits and Irreparable Injury**

1. **The City of Poway and Map 133**

---

as the City's agent" and would be bound by an injunction. (ECF No. 117 at 13). The Court does not reach contentions regarding the County Registrar.

Whether a Fourteenth Amendment racial gerrymandering claim can prevail on the merits requires "a two-step analysis." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017). First, the plaintiff has the burden to "prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). To carry that burden, the plaintiff must demonstrate "that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Id.* at 1463–64. Because a federal court's review "of districting legislation represents a serious intrusion on the most vital of local functions," the plaintiff must overcome a "presumption of legislative good faith." *Abbott*, slip op. at 21 (quoting *Miller*, 515 U.S. at 915). The plaintiff may use "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* Second, if the challenger has shown racial considerations predominated the districting decision, the "design of the district must withstand strict scrutiny." *Id.* at 1464. The burden shifts to the state "to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.*

Initially, the Court must address whether the adoption of district lines constitutes a "decision to place a significant number of voters within or without a particular district" for purposes of a Fourteenth Amendment racial gerrymandering claim, compared to typical racial gerrymandering claims challenging specific features of resulting districts. *Cooper v. Harris*, 137 S. Ct. at 1463. The Court must also address whether the CVRA constitutes a "racial consideration" for purposes of a Fourteenth Amendment racial gerrymandering claim. *See Cooper*, 137 S. Ct. at 1463; *see also Mazurek*, 520 U.S. at 972 (requiring the movant to make "*a clear showing*").

Higginson presents evidence showing that the City of Poway adopted by-district elections in response to a letter threatening a CVRA lawsuit. Higginson asserts that the CVRA is "dominated by racial considerations." (ECF No. 101-1 at 22). However, the Attorney General and LULAC maintain that "the CVRA does not, as Plaintiff contends,

14

require political subdivisions to engage in racial gerrymandering," or "prescribe a particular remedy where vote dilution occurs." (ECF No. 113 at 13; ECF No. 114 at 17).

At this stage in the proceedings, given the unresolved questions of law and fact, the Court finds that Higginson has not shown a likelihood of prevailing on the merits of his Fourteenth Amendment racial gerrymandering claim. Higginson is injured only if the CVRA caused the City of Poway to adopt Map 133 using predominantly racial considerations, and if Map 133 was not narrowly tailored to a compelling interest. *Pena*, 865 F.3d at 1217 ("[A] party must show . . . that he is likely to suffer irreparable harm in the absence of preliminary relief."); *see also Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986) (finding that plaintiffs who failed to show a likelihood of success on the merits had "failed to establish that irreparable harm will flow from a failure to preliminarily enjoin defendants' actions"); *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 921 (E.D. Va. 2018) ("[E]ven if this single factor weighs in favor of plaintiffs, plaintiffs' failure to make a clear showing of likelihood of success on the merits nonetheless ends the matter.").

## 2. The Attorney General

Higginson moves the Court to enjoin the Attorney General "and his agents" from enforcing the CVRA "during the pendency of this action." (ECF No. 101 at 2). The Attorney General contends that he "has taken no action and made no threats to enforce the CVRA at this time," and that "there is no reason to assume he would do so between now and the November election." (ECF No. 113 at 19–20). The Attorney General further contends that enjoining him from CVRA enforcement would not "forestall the injuries that Plaintiff contends would result from voting under Map 133." *Id.* at 6.

The Supreme Court has explained that "a plaintiff who alleges that he is the object of a racial gerrymander . . . has standing to assert only that his own district has been so gerrymandered." *Gill v. Whitford*, No. 16–1161, slip op. at 14–15 (U.S. June 18, 2018). Such plaintiffs "cannot sue to invalidate the whole State's legislative districting map; such complaints must proceed 'district-by-district.'" *Id.* at 15 (quoting *Ala. Legislative Black*

*Caucus*, 135 S. Ct. 1257, 1265 (2015)). The "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* at 16 (quotation omitted).

The claimed "irreparable harm must be causally connected to the activity to be enjoined" to support a preliminary injunction. *Nat. Wildlife v. Nat. Marine Fisheries*, 886 F.3d 803, 819 (9th Cir. 2018). In this case, Higginson has not come forward with facts to show a causal connection between the alleged irreparable harm—infringement of his constitutional rights under Map 133—and the Attorney General's enforcement of the CVRA. The Court finds that Higginson has failed to carry his burden to show he is entitled to a preliminary injunction against the Attorney General and his agents.

## VI. CONCLUSION

The Court finds that Higginson has not demonstrated sufficient likelihood of success on the merits of his claim or irreparable injury absent injunctive relief, or that the balance of equities or public interest weigh in his favor.

IT IS HEREBY ORDERED that the motion for a preliminary injunction (ECF No. 101) is DENIED.

Dated: October 2, 2018

Hon. William Q. Hayes
United States District Court